**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LISA HAWKINS,
Plaintiff-Appellant,

v.

PEPSICO, INCORPORATED, d/b/a Pepsi-
Cola North America, d/b/a Pepsi-
Cola Bottling Company, d/b/a Pepsi

No. 98-2193

South,
Defendant-Appellee.

AMERICAN CIVIL LIBERTIES UNION OF
NORTH CAROLINA LEGAL FOUNDATION,
INCORPORATED; NORTH CAROLINA
ACADEMY OF TRIAL LAWYERS,
Amici Curiae.

Appeal from the United States District Court
for the Middle District of North Carolina, at Winston-Salem.
William L. Osteen, District Judge.
(CA-96-1013-6)

Argued: October 26, 1999

Decided: February 15, 2000

Before WILKINSON, Chief Judge, and WIDENER and KING,
Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Widener and Judge King joined.

_____

**COUNSEL**

**ARGUED:** Joyce Leigh Davis, JOYCE L. DAVIS & ASSOCIATES, Raleigh, North Carolina, for Appellant. Charisse R. Lillie, BALLARD, SPAHR, ANDREWS & INGERSOLL, L.L.P., Philadelphia, Pennsylvania, for Appellee. **ON BRIEF:** Zoe G. Mahood, JOYCE L. DAVIS & ASSOCIATES, Raleigh, North Carolina, for Appellant. Suzanne E. Turner, Matthew M. Gutt, BALLARD, SPAHR, ANDREWS & INGERSOLL, L.L.P., Philadelphia, Pennsylvania; Cecil W. Harrison, Jr., POYNER & SPRUILL, L.L.P., Raleigh, North Carolina, for Appellee. John W. Gresham, FERGUSON STEIN LAW OFFICES, Charlotte, North Carolina; Deborah K. Ross, AMERICAN CIVIL LIBERTIES UNION OF NORTH CAROLINA, Raleigh, North Carolina; Henderson Hill, NORTH CAROLINA ACADEMY OF TRIAL LAWYERS, Charlotte, North Carolina, for Amici Curiae.

_____

**OPINION**

WILKINSON, Chief Judge:

Appellant Lisa Hawkins filed an employment discrimination suit against appellee PepsiCo, Inc. Hawkins alleged, inter alia, that her supervisor created a racially hostile environment and terminated Hawkins because of racial animus. Hawkins, however, has shown nothing more than a routine difference of opinion and personality conflict with her supervisor. Because we refuse to transmute such ordinary workplace disagreements between individuals of different races into actionable race discrimination, we affirm the judgment of the district court dismissing Hawkins' claims.

I.

Lisa Hawkins was employed by Pepsi from 1990 to 1994. She began as a Brand Manager and was promoted to Franchise Manager in 1991. She became an Administrative Manager in 1992 and served in that position until it was eliminated in June 1993. That same month, Hawkins was hired by Sally Price, General Manager of Pepsi's newly formed Customer Service Center (CSC) in North Caro-

2

lina, to be a Tel-Sell (telephone sales) Manager. Hawkins reported directly to Price in her new position.

Because the district court dismissed Hawkins' claims on Pepsi's motions for summary judgment and judgment as a matter of law, we view the evidence in the light most favorable to her. See Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 768 (4th Cir. 1997); Brown v. CSX Transp., Inc., 18 F.3d 245, 248 (4th Cir. 1994). Hawkins, who is African-American, claims that Price, who is white, engaged in various forms of race discrimination against her at the CSC. Hawkins advances a long list of complaints about Price. She alleges that she and Price had a strained relationship that was unlike the relationships between Price and the white managers Price supervised. Price did not adequately inform Hawkins of her responsibilities and gave Hawkins instructions on scraps of paper. Hawkins' suggestions at meetings were often criticized or laughed at by Price. Price rarely praised Hawkins in public. Price failed to acknowledge Hawkins' input and criticized her for not being a "team player." Hawkins perceived all of this to be in marked contrast to Price's treatment of Hawkins' white peers. Price also told Hawkins that she was "not of the caliber" to be a CSC manager, but Hawkins never heard Price use the same phrase to describe a white person's performance. Hawkins further claims that Price subjected Fred Canady, the only other African American who reported directly to Price, to similar criticism.

According to Hawkins, when Price criticized a document that Hawkins had prepared, Hawkins presented her with the same document the next day and falsely claimed that a white manager had also worked on it. Price then told Hawkins that the document looked great. Price also gave gifts to all managers except Hawkins during a dinner at Price's home. After Hawkins took a personality test upon Price's orders, Hawkins believed Price mocked the results even though Price did not laugh at white managers with the same personality type. When Hawkins suggested that she and Price attend a seminar entitled "Successful Managerial Skills for Black Managers," Price refused.

What Hawkins disputes most vigorously, however, is the accuracy of Price's evaluation of her job performance. For example, in a January 1994 performance appraisal, Price rated Hawkins "below target" in several areas and criticized her even in areas where Hawkins

3

received a satisfactory grade. Hawkins alleges that Price's assessment of her performance was excessively negative and often based on erroneous information. Hawkins also claims that Price's feedback was in some instances too general and failed to elaborate on the positive aspects of Hawkins' performance. Hawkins further states that Price also gave Canady a "below target" rating while rating all white employees who reported to her "on target" or"above target."

Hawkins complained about Price to several members of Pepsi's senior management. For example, Hawkins faxed a memo to Pepsi's Chief Operating Officer but allegedly received no response. Hawkins states that she also shared this memo with Price and discussed it with her to no avail. Several other senior managers advised Hawkins on dealing with Price and said that they would follow up on the matter. Hawkins claims, however, that Pepsi's efforts to investigate and remedy her situation were on the whole inadequate.

Hawkins also states that she had previously complained to Pepsi management about racial concerns when she was a Franchise Manager. She alleges that long before she encountered Price, she had racial problems with Lee Teeter, a Pepsi bottler, and that her complaints caused racial tension with her supervisor at the time. Hawkins claims that Price was aware of Hawkins' complaints stemming from this incident.

In February 1994, Hawkins met with Price and CSC Human Resources Director Jane Marvin for a performance review. They discussed Hawkins' performance, Hawkins' difficulties with Price, and the possibility of Hawkins' seeking other employment, including a sales position within Pepsi. Price cautioned, however, that she was uncomfortable recommending Hawkins for a sales position because she had not seen her sell.

On March 3, 1994, Hawkins met with Price and then Marvin to review her situation. During her time at the CSC, Hawkins had worked mostly on special projects for Price rather than in a Tel-Sell capacity. Marvin stated that Hawkins was no longer needed for special projects and that there was no Tel-Sell opportunity for her in the CSC. Marvin also said that no sales position was available for Haw-

kins. Marvin then handed Hawkins a termination letter informing her that she was discharged effective the following day.

On September 12, 1996, Hawkins filed an employment discrimination lawsuit against Pepsi in the United States District Court for the Middle District of North Carolina. Hawkins alleged that Pepsi discriminated against her on the basis of race in violation of 42 U.S.C. § 1981 and state law. She claimed that she was the victim of a hostile work environment and was wrongfully discharged because of her race and/or in retaliation for her complaints of race discrimination. Hawkins also accused Pepsi of intentional and negligent infliction of emotional distress.

At the close of discovery, the district court granted summary judgment to Pepsi on a number of Hawkins' claims. The court held that Hawkins had failed to produce sufficient evidence of a racially hostile environment. The court also dismissed her emotional distress claims and held that any claims based on events prior to Hawkins' tenure at the CSC were time-barred.

The parties proceeded to trial on Hawkins' remaining claims of discriminatory and retaliatory discharge. After Hawkins had presented her case, Pepsi moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The district court granted Pepsi's motion on two alternative grounds. See Hawkins v. PepsiCo, Inc., 10 F. Supp. 2d 548 (M.D.N.C. 1998). First, the court held that an at-will employee cannot maintain a § 1981 action for wrongful termination because the employer and employee have no contractual relationship concerning the duration of employment. See id. at 553-54. This ground has subsequently been rejected by our decision in Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018-19 (4th Cir. 1999) (holding that an at-will employment relationship is contractual and may serve as a predicate contract for a § 1981 claim). Second, the district court held that Hawkins had failed to produce sufficient evidence to support her claims of discrimination and retaliation. See Hawkins , 10 F. Supp. 2d at 554-55.

Hawkins then appealed the district court's dismissal of all her employment discrimination claims.

5

II.

A.

Because Hawkins presents no direct evidence of discrimination, her discriminatory discharge claims are subject to the burden-shifting scheme of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny. See Patterson v. McLean Credit Union, 491 U.S. 164, 186 (1989) (McDonnell Douglas scheme applies to § 1981 actions). Assuming arguendo that Hawkins has made a prima facie case of race discrimination, "the burden of production shifts to [Pepsi] to articulate some legitimate, nondiscriminatory reason" for its action. O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 311 (1996) (internal quotation marks omitted). Once Pepsi meets this burden, Hawkins must prove that Pepsi's proffered reason was mere pretext and that race was the real reason for her termination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993). To avoid judgment as a matter of law on this question, Hawkins must establish a "legally sufficient evidentiary basis for a reasonable jury to find for [her]." Fed. R. Civ. P. 50(a). "[S]ummary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion." McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 356 (1991).

Pepsi asserts that Hawkins was terminated for performance-related reasons. Pepsi claims that Hawkins performed poorly in her special projects capacity and failed to improve even after receiving negative feedback. Pepsi also states that Hawkins' poor performance, coupled with the lack of available work, led Price to discontinue Hawkins' special projects position and not to place her in a different position with Pepsi. Hawkins contends that Pepsi's justification is pretextual and that she was instead terminated because of Price's racial animus toward her. The district court found, however, that Hawkins failed to carry her burden of producing sufficient evidence to support a finding of intentional discrimination.

Hawkins has failed to demonstrate that the district court erred. To begin with, Hawkins has failed to show that Pepsi's proffered reasons for her termination were pretextual. Hawkins claims that Price's criticisms were inaccurate and insists that she actually performed her CSC

6

job well. But when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff,"it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (internal quotation marks omitted). And Hawkins cannot show that Pepsi's stated reasons for terminating her were not the real reasons for her discharge.

Hawkins fails, for example, to supply evidence that Price actually believed her performance was good. In fact, the evidence presented by Hawkins shows that Price considered Hawkins' performance to be generally poor. For instance, Hawkins submitted into evidence Price's January 1994 performance appraisal of Hawkins. This appraisal appears to be Hawkins' biggest bone of contention in this case. Price evaluated Hawkins' performance in four specific areas, or "accountabilities." The four accountabilities were: (1) "With CSC A/R and Tel-Sell Teams, select, on-board, and train A/R and Tel-Sell performers for start-up operation"; (2) "Build information resource for CSC on existing Tel-Sell operations at Pepsi and at relevant bench mark companies"; (3) "Support 10-X Lab and FIT team in finalizing Tel-Sell Design and Implementation"; and (4) "Field Ready Materials developed for National Roll-out of Centralized Tel-Sell."

Each of these accountabilities was broken down into one or more specific "measures." Price assigned a rating, accompanied by detailed written comments, to Hawkins' performance on each of these measures. On the first accountability, Price rated Hawkins "on target" on one measure, "below target" on another, and"significantly below target" on another. On the second accountability, Price gave Hawkins an "on target" rating on one measure and a "below target" rating on two others. On the third accountability, Price rated Hawkins "on target" on one measure and "below target" on another. On the fourth accountability, Price rated Hawkins "on target."

Price gave Hawkins an overall rating of "below target" on the appraisal. Price's general comments on Hawkins' performance consisted of the following:

> Lisa demonstrated flexibility in responding to the changes in
> her accountabilities caused by the slow-down in the national

7

roll-out of Tel-Sell. Her performance against these account-abilities though has not met targeted expectations. Lisa consistently has faced difficulties in three areas: (1) team building and alignment, (2) results orientation, (3) thoughtful analysis. Lisa's performance was on target when tasks were specifically spelled out for her, required little independent thought, and when she did not need to solicit input or involvement from others. Her performance was below target when she was required to interact with others to gain information or deliver results, when she needed to develop her own project structure and sustain her own project momentum or when she needed to provide her own insights and draw her own inferences from information. Lisa consistently dropped the ball on projects, provided inadequate follow-through and, as a result, missed deadlines. She is too quick to hand-off tasks to others and jumps to obvious conclusions without analyzing alternatives or thinking through implications. In addition, Lisa has been too easily distracted by non-business issues particularly ones involving personnel issues or office politics. She fills a disproportionate amount of her time on non-business issues and can be a distracting influence. As a member of the leadership team, I expect Lisa to rise above these issues and focus her energies on creating a positive work environment and delivering concrete business results. Overall, Lisa's performance has been unacceptable for someone at her level in the organization.

This appraisal, along with other evidence introduced by Hawkins, shows quite strongly that Price was dissatisfied with Hawkins' performance. But instead of producing evidence that shows Price's assessment of her performance was dishonest or not the real reason for her termination -- as the law requires -- Hawkins disputes the merits of Price's evaluations. Hawkins took vigorous issue with the January 1994 performance appraisal at length both at trial and in her brief. She argues that she performed well in her job and offers evidence in an effort to support this contention, including e-mails and memoranda written by Hawkins herself and statements allegedly made by her co-workers. In doing so, Hawkins can prove only the unremarkable fact that she and Price disagreed about the quality of her work. But we

8

have repeatedly held that in a wrongful discharge action "`[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.'" Id. (quoting Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996)); see also Smith v. Flax, 618 F.2d 1062, 1067 (4th Cir. 1980). The alleged opinions of Hawkins' co-workers as to the quality of her work are similarly "`close to irrelevant.'" DeJarnette, 133 F.3d at 299 (quoting Conkwright v. Westinghouse Elec. Corp., 933 F.2d 231, 235 (4th Cir. 1991)).

In short, we do not sit to appraise Price's appraisal. Rather, "[o]ur sole concern is whether the reason for which the defendant discharged the plaintiff was discriminatory." Id. (internal quotation marks omitted). Hawkins' extensive efforts to rebut Price's assessment of her performance simply do not provide a legally sufficient basis for this conclusion.

Hawkins also disputes Price's alleged inability to find a position for Hawkins. But Hawkins does not, for example, provide evidence that Price's decision not to sponsor her for a sales position was due to anything other than Price's assessment of her CSC performance and unfamiliarity with her sales ability. Further, Pepsi was not obligated to provide employment to Hawkins even if an appropriate position were available. For § 1981 does not compel employers to practice "economic altruism and thereby immunize protected class members from discharge" for performance-related reasons. Gairola v. Virginia Dep't of Gen. Servs., 753 F.2d 1281, 1287 (4th Cir. 1985).

Moreover, Hawkins does nothing more than speculate that Price terminated her out of racial animus. The thrust of Hawkins' claims is that Price inappropriately criticized and insulted her in various ways. Hawkins accuses Price of such things as regarding her as "not of the caliber" to be a CSC manager, rejecting her input at meetings, making fun of her personality type, and failing to give her a gift at a party. But these sorts of disagreements and misunderstandings are ordinary occurrences in a workplace setting. We decline to impute a racial character to them based simply on Hawkins' conjecture.

Hawkins attempts to frame Price's behavior in racial terms by charging that Price did not subject any of Hawkins' white peers to

9

similarly poor treatment. But Hawkins presents no facts that tend to show this allegedly disparate treatment was due to race rather than Price's admittedly low regard for Hawkins' individual performance. Hawkins has demonstrated that she and Price did not see eye-to-eye. But this showing of a difference of opinion, coupled with Hawkins' conclusory allegations of racism, cannot reasonably support the conclusion that Hawkins' discharge was motivated by racial animus. For "a plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action." Williams v. Cerberonics, Inc., 871 F.2d 452, 456 (4th Cir. 1989). And no court sits to arbitrate mere differences of opinion between employees and their supervisors.[1]

B.

Furthermore, the district court did not err in granting summary judgment to Pepsi on Hawkins' hostile environment claims. A plaintiff can prevail on such a claim only when there is racial harassment "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted). Hawkins relies on much the same evidence to support her hostile environment claims as she does to support her discriminatory discharge claims. For example, in addition to the allegations mentioned earlier, Hawkins claims that she received inadequate coaching,

_____

[1] The district court also correctly granted judgment as a matter of law to Pepsi on Hawkins' retaliatory discharge claims. The McDonnell Douglas framework applicable to claims of race discrimination applies to retaliation claims as well. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998). Thus, assuming arguendo that Hawkins has made a prima facie case of retaliation, she has failed to prove that Pepsi's legitimate, non-discriminatory reasons for her termination were pretextual for the reasons stated above. Further, Hawkins relies on mere speculation in asserting that her prior racial complaints were the real reason for her termination. As to her prior racial complaints about a Pepsi bottler, Hawkins shows only that Price had some knowledge of her complaints. There is also substantial evidence that Price was dissatisfied with Hawkins' performance before Hawkins' complaints about Price to senior management.

had to do work over and over, was unreasonably required to work late the night of an office Christmas party, and did not have access to the same work opportunities as other managers.

Again, Hawkins cannot show that these problems were racial in nature. Indeed, her complaints about Price's management style toward her are without a hint of racial significance. Even if Price harbored some personal dislike of Hawkins that made Hawkins' job more difficult or stressful, "[a]n employer is not required to like his employees." Cerberonics, 871 F.2d at 457 (internal quotation marks omitted). And it is for PepsiCo, not the courts, to rule on the wisdom and generosity of Price's management practices. Thus, in the absence of sufficient evidence of racial harassment, the district court correctly dismissed Hawkins' claims.**2**

We note further that the district court properly dismissed Hawkins' state employment practices claims along with her§ 1981 claims because the evidentiary standards for the state and federal claims are the same. See Hughes v. Bedsole, 48 F.3d 1376, 1383 (4th Cir. 1995). We have also reviewed Hawkins' objections to various evidentiary rulings of the district court and find them to be without merit.

_____

**2** The district court also properly awarded summary judgment to Pepsi on Hawkins' claims based on events occurring prior to Hawkins' tenure at the CSC. These claims were time-barred by North Carolina's three-year statute of limitations for § 1981 claims unless Hawkins could show that the alleged incidents were part of a continuing violation. See, e.g., Beall v. Abbott Lab., 130 F.3d 614, 621 (4th Cir. 1997). Because Hawkins cannot maintain a claim based on alleged events within the limitations period, there is no present violation to which any acts outside the limitations period could attach. See Tinsley v. First Union Nat'l Bank, 155 F.3d 435, 442-43 (4th Cir. 1998) (continuing violation theory requires that at least one act of discrimination occur within the limitations period). And even were Hawkins able to establish a claim based on her CSC experiences, she has failed to demonstrate any connection between her previous difficulties as a Franchise Manager and her problems with Price.

11

III.

There is evidence in the record that suggests Price was a tough, demanding supervisor. Hawkins recounts instances when Price required her to redo documents and work late. Hawkins states that Price was often unreceptive to her ideas. And, as Hawkins alleges, Price's criticism of her may have been blunt and even at times unfair. But the types of difficulties that Hawkins encountered with Price arise routinely in employment relationships. See Van Stan v. Fancy Colours & Co., 125 F.3d 563, 567 (7th Cir. 1997) ("[P]ersonality conflicts and questioning of job performance are unavoidable aspects of employment." (internal quotation marks omitted)). They are an inevitable byproduct of the rough edges and foibles that individuals bring to the table of their interactions. Law does not blindly ascribe to race all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Instead, legally sufficient evidence is required to transform an ordinary conflict such as that between Hawkins and Price into an actionable claim of discrimination. See, e.g., Gairola, 753 F.2d at 1285 (evidence is legally insufficient if verdict for party offering that evidence would be necessarily based on speculation and conjecture). The need for legally sufficient evidence of discrimination is critical in the context of this lawsuit. Otherwise, supervisors such as Price could not evaluate employees of a different race without the prospect of a lawsuit. As the Fifth Circuit has noted, without the freedom to criticize performance, an organization simply cannot function. See Johnson v. Merrell Dow Pharms., Inc., 965 F.2d 31, 34 (5th Cir. 1992) ("In order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees."). The dilemma is apparent. If supervisors fail to supply enough criticism, they may be accused of a lack of feedback. If they criticize too much, they may be accused of discriminatory harassment. Either way they may find themselves hauled into court to answer for their choice. The instant case illustrates this very danger, as Hawkins at some points takes issue with Price's reticence about her performance and at other points complains about Price's excessive feedback. Her suit amounts mostly to an effort to seek judicial review of the quantity and quality of workplace criticism. The district court properly dismissed the action, for employment discrimination law "is not a vehicle for substituting the judgment of a court for that of the employer." Jiminez

12

v. Mary Washington College, 57 F.3d 369, 377 (4th Cir. 1995). Accordingly, the judgment is

AFFIRMED.

13