Charles JULSAINT, Plaintiff,

v.

**CORNING, INCORPORATED,**
Defendant.

No. 1:00CV00313.

United States District Court,
M.D. North Carolina.

Dec. 5, 2001.

Michael A. Sheely, Charlotte, NC, Vicki Brown Rowan, Charlotte, NC, for Plaintiff.

Jonathan Woodward Yarbrough, Loris S. D'Alessio, Charles Daniel Barrett, Edwards, Ballard, Clark, Barrett and Carlson, P.A., Winston-Salem, for Defendant.

### MEMORANDUM OPINION

BEATY, District Judge.

## I. INTRODUCTION

This matter comes before the Court on Defendant Corning, Incorporated's Motion for Summary Judgment (Document # 19). For the reasons stated herein, Defendant Corning, Incorporated's Motion for Summary Judgment is GRANTED and all claims against it are hereby DISMISSED.

## II. FACTUAL AND PROCEDURAL BACKGROUND

In 1995, Charles Julsaint ("Plaintiff") interviewed with Corning, Incorporated ("Defendant") and ultimately received a written offer for the position of "Process Control Engineer." (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 1.) When Plaintiff reported to work on June 12, 1995 at the Wil-

mington, North Carolina facility, however, he learned that his job title was actually "Associate Computer System Engineer." (*Id.*) This was a lower entry-level position than the position he was originally offered. (*Id.*, at 1–2.) Nevertheless, Plaintiff accepted the employment.

Plaintiff's first supervisor in Wilmington was Thomas Cerwonka. (*Id.*, at 2.) Plaintiff received his first performance evaluation from Mr. Cerwonka on February 15, 1996, which covered his first eight months on the job. (*Id.*) The evaluation commended Plaintiff for his work ethic, attitude, and technological potential. (*Id.*) In fact, Defendant admits that its initial impression of Plaintiff was favorable. (Def.'s Br. Supp.Mot.Summ.J., at 2.)

According to Defendant, Plaintiff's work performance unfortunately began to deteriorate during 1996. (*Id.*) Mr. Cerwonka, therefore, asked Rodney Ringler to work with Plaintiff on some of his projects. Because Mr. Ringler had not worked in Plaintiff's area for some time, he could not remember enough of the technical aspects of the job to provide Plaintiff with much assistance. (Pl.'s Br.Resp.Def.'s Mot. Summ.J., at 3.) Nevertheless, Plaintiff maintains that his work performance was acceptable. He admitted in his deposition testimony, however, that Mr. Cerwonka's perception of his work performance had declined. (Pl.'s Dep., at 135–37.)

In late 1996, Plaintiff received a new supervisor, Mike Schaub. In an apparent effort to boost Plaintiff's performance, Mr. Schaub adjusted Plaintiff's assignments and provided him with a mentor—once again, Rodney Ringler. (Def.'s Br. Supp.Mot.Summ.J., at 3.) Plaintiff claims, however, that he was treated poorly by Mr. Schaub, and was not given any assistance, even though he allegedly had more duties than other programmers at the Wilmington facility. (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 4.) Plaintiff specifically references an incident where Mr. Schaub told him to "shut up" when Plaintiff attempted to ask a question at a meeting. (*Id.*)

Because he had supervised Plaintiff for the majority of the 1996 calendar year, Mr. Cerwonka met with Plaintiff on February 25, 1997 to review his second performance evaluation. Consistent with Plaintiff's self-assessment of the quality of his work, Plaintiff describes his second performance evaluation as positive. He claims that he was commended for certain project completions and his pleasant demeanor. (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 3.) An excerpt from his performance evaluation, however, paints a different picture:

> Charles has had some difficulty developing his Corning specific technical expertise. Charles attended a significant amount of formal technical training during 1996. However it is warranted that Charles focus his efforts on Corning specific real-time process controls training in the coming year. Additionally, there was often mis-communication surrounding deployment of changes and trouble-shooting activities where Charles was involved. Customer feedback indicates that Charles can be defensive and has a tendency to point fingers when things go wrong.

(Def.'s Br.Supp.Mot.Summ.J., at 3.)

Around the time that Mr. Schaub was assigned to supervise Plaintiff, Defendant began seeking volunteers to relocate to a new facility in Concord, North Carolina. (*Id.*, at 4.) Plaintiff viewed this as an opportunity for advancement, and therefore made it known that he was interested in transferring to the Concord location. In fact, Plaintiff claims that he was to be promoted within six months of transferring to the Concord facility. (*Id.*) Defendant denies ever having made such a

promise. (Answer, at 7) (denying all allegations that Plaintiff was ever promised a promotion.) Plaintiff never received the promotion he was allegedly promised. (Def.'s Br.Supp.Mot.Summ.J., at 4.)

It was in June of 1997 when Plaintiff actually made the transfer to Concord, where Dan Ogorchock became Plaintiff's supervisor. Once Plaintiff arrived in Concord, Mr. Ogorchock assigned to him a project that was to be completed by December 4, 1997. (Def.'s Br. Supp.Mot.Summ.J., at 5–6.) Because of Mr. Ogorchock's alleged redirection of the project, and several technical problems that Plaintiff claims were out of his control, the project was not completed on time. Plaintiff claims that the project was eventually completed, while Mr. Ogorchock maintains that Plaintiff never successfully completed the task. (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 6–7.)

In February of 1998, Mr. Ogorchock met with Plaintiff to review his 1997 performance evaluation. According to Plaintiff, Mr. Ogorchock slammed the evaluation on the table and demanded that Plaintiff sign it. (Id., at 7.) The evaluation, which contained information compiled by Mr. Schaub (for the portion of 1997 during which he supervised Plaintiff) and Mr. Ogorchock, was generally negative as to Plaintiff's job performance. The evaluation also contained customer and peer feedback, which was likewise negative with respect to Plaintiff's performance. (Def.'s Br.Supp.Mot.Summ.J., at 7–8.) Moreover, the evaluation required that Plaintiff complete a Performance to Standard Plan ("PSP"). The PSP set a series of milestones that Plaintiff had to accomplish by specific dates in order to keep his job. (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 7.)

Although there is some debate regarding whether Plaintiff met the first three milestones, Plaintiff admits that the first milestone was not completed on time. (Id.) Plaintiff claims, in his Brief in Response to Defendant's Motion for Summary Judgment, that the second milestone was satisfied. (Id.) His deposition, however, plainly admits that the second milestone was not completed. (Pl.'s Dep., at 311.) Plaintiff also failed to complete the third milestone, although he claims it was due to exigent circumstances. (Pl.'s Br. Resp.Def.'s Mot.Summ.J., at 8.) According to Plaintiff, the third milestone was due on February 27, 1998—his wedding day. Plaintiff was not at work that day, or several days thereafter due to his wedding and honeymoon. As of March 9, 1998, Plaintiff had still not completed the third milestone. Around this same time, Plaintiff learned that his grandfather had died. When Plaintiff approached Mr. Ogorchock to discuss his plans for attending the funeral, Mr. Ogorchock told him that he had to go to a meeting, and they would discuss the plans later. Plaintiff, however, left work without further speaking to Mr. Ogorchock about his plans to attend the funeral. (Id.) Plaintiff apparently left an email for Mr. Ogorchock indicating that he was sleepy, and that he went home to rest before starting the drive to Florida for the funeral. (Def.'s Br.Supp.Mot.Summ.J., at 9.)

On March 16, 1998, Plaintiff's first day back on the job after attending the funeral, he met with Mr. Ogorchock to discuss the status of the third milestone, which had been due on February 27, 1998. As previously stated, Plaintiff admits that it was never completed. (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 8.) Furthermore, on March 17, Plaintiff sent Mr. Ogorchock an email informing him that he would be late for work the following day because he had to pick up his mother from the airport. (Id.) Plaintiff and Mr. Ogorchock were scheduled to meet on March 18 concerning

another milestone that was due that day. Plaintiff, however, never reported to work on March 18. Plaintiff claims that he attempted to contact Mr. Ogorchock to tell him that he would not make it to work that day; Mr. Ogorchock denies having received such a message. (*Id.*, at 8–9.)

Plaintiff also did not report for work on March 19, 1998, allegedly because he was suffering from headaches. (*Id.*, at 9.) Plaintiff claims that he tried to email Mr. Ogorchock to advise him that he was not coming to work, but was unable to. Plaintiff later learned that his email was unsuccessful because Mr. Ogorchock had terminated his email account earlier in the day. After Mr. Ogorchock left two messages at Plaintiff's home, Plaintiff called and told Mr. Ogorchock that he was staying home due to his headaches. During the course of their conversation, Plaintiff announced that he would be taking five days off, under the advice of his physician, to help relieve his stress. (Def.'s Br. Supp.Mot.Summ.J., at 11.) On March 24, 1998, Plaintiff mailed in a physician's statement, in which his doctor stated that he had seen Plaintiff on March 20, 1998, the day after Plaintiff told Mr. Ogorchock that he was taking time off on the advice of his doctor. (*Id.*)

When Plaintiff did not report to work on March 20, Mr. Ogorchock telephoned him at home and told him that he needed to come to work on March 25 for a meeting in which they were to discuss his poor job performance and his recent unacceptable behavior. (*Id.*) Plaintiff claims that during the course of this conversation, Mr. Ogorchock told him he was stupid and called

him a liar. (Pl.'s Br.Resp.Def.'s Mot. Summ.J., at 9.) As their conversation became heated, Plaintiff hung up on Mr. Ogorchock. (Def.'s Br. Supp.Mot.Summ .J., at 11.) When Plaintiff arrived for the meeting on March 25, he was given the option to either resign or be terminated. After consulting with his wife, Plaintiff told his supervisors that he refused to resign. Thereafter, Defendant terminated Plaintiff's employment. (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 9.) The following day, March 26, 1998, Plaintiff was sent a letter to confirm the March 25 conference in which his employment was terminated. (Def.'s Br.Supp.Mot.Summ.J., at 12.) The letter identified the basis for Plaintiff's termination as his failure to satisfy the milestones outlined in the PSP and his recent unacceptable behavior. (Pl.'s Dep .Ex. 26.)

Plaintiff filed suit against Defendant on March 29, 2000 alleging a federal claim for race discrimination under 42 U.S.C. § 1981 [1] as well as a North Carolina state law claim for wrongful discharge in violation of public policy as set forth in N.C.Gen.Stat. § 143–422.2. This matter is currently before the Court on Defendant's Motion for Summary Judgment with respect to all of Plaintiff's claims.

## III. DISCUSSION

### A. Summary Judgment Standard

Summary Judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Thus, the Court is not

---

**1.** Although 42 U.S.C. § 1981 does not specifically refer to "race," it has been construed by the United States Supreme Court to forbid all racial discrimination in the making of private as well as public contracts. *Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 609, 107 S.Ct. 2022, 2026, 95 L.Ed.2d 582 (1987);

*Runyon v. McCrary,* 427 U.S. 160, 168, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976). In fact, § 1981 actions even serve to protect at-will employees from race discrimination. *Spriggs v. Diamond Auto Glass,* 165 F.3d 1015, 1018–19 (4th Cir.1999).

" 'required to submit a question to a jury merely because some evidence has been introduced by the party having the burden of proof, unless the evidence be of such a character that it would warrant the jury in finding a verdict in favor of that party.' " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting *Schuylkill & Dauphin Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867, 872 (1872)). In considering a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party, in this case, Plaintiff, and accord that party the benefit of all reasonable inferences. *Bailey v. Blue Cross & Blue Shield*, 67 F.3d 53, 56 (4th Cir.1995), *cert. denied*, 516 U.S. 1159, 116 S.Ct. 1043, 134 L.Ed.2d 190 (1996). Moreover, the Court should not grant a motion for summary judgment " 'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.' " *Campbell v. Hewitt, Coleman & Assocs.*, 21 F.3d 52, 55 (4th Cir.1994) (quoting *Phoenix Sav. & Loan, Inc. v. Aetna Cas. & Sur. Co.*, 381 F.2d 245, 249 (4th Cir. 1967)). Nevertheless, a mere scintilla of evidence is insufficient to withstand a motion for summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202. There must be evidence "on which the jury could reasonably find for the plaintiff ." *Id.* With this standard in mind, the Court must evaluate the merits of Plaintiff's claims to determine whether summary judgment in favor of Defendant is proper.

**B. Defendant's Motion for Summary Judgment**

**1. Plaintiff's First Cause of Action: 42 U.S.C. § 1981**

Although Defendant's Motion for Summary Judgment identifies three claims under 42 U.S.C. § 1981—for wrongful discharge, inaccurate job performance reviews, and failure to promote—the Court will consider them together, as a single cause of action for race discrimination with multiple grounds.[2]

■ Because Plaintiff has offered no direct evidence of racial discrimination, his discrimination claims are subject to the burden-shifting scheme of the *McDonnell Douglas* test. *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir.), *cert. denied*, 531 U.S. 875, 121 S.Ct. 181, 148 L.Ed.2d 125 (2000); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *see also Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989) (stating that the *McDonnell Douglas* scheme applies to actions under § 1981). Under *McDonnell Douglas*, the plaintiff bears the burden of first establishing a prima facie case. *Murrell v. Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir.2001). To satisfy this burden, a plaintiff must demonstrate that (1) he is a

---

**2.** Plaintiff's Complaint follows this approach, asserting a single cause of action under 42 U.S.C. § 1981. Plaintiff simply identified Defendant's alleged discriminatory failure to promote, inaccurate job performance reviews, and wrongful discharge as distinct incidents of disparate treatment, offered to support his claim for race discrimination. (Compl.¶ 18.)

Defendant also contends that all of Plaintiff's claims except the claim for wrongful discharge have been abandoned, as they were not argued by Plaintiff in response to Defendant's summary judgment motion. Although Plaintiff did, in fact, fail to argue several of its claims in its Brief in Response to Defendant's Motion for Summary Judgment, the Court will nevertheless consider the merits of the claims.

member of a protected class, (2) he suffered an adverse employment action, (3) he performed the job at a level that met the employer's legitimate expectations, and (4) the adverse employment action occurred under circumstances which create an inference of unlawful discrimination.[3] *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir.1995); *Gairola v. Commonwealth of Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1286 (4th Cir.1985).

■ Once the plaintiff establishes a prima facie case, the employer must respond with evidence that it acted with a legitimate, nondiscriminatory purpose. *Murrell*, 262 F.3d at 257. If the employer meets this burden of production, the presumption of unlawful discrimination created by the prima facie case vanishes, requiring the plaintiff to prove that the employer's proffered reason is a pretext for discrimination in order to recover. *Id.* In light of *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), no longer is a plaintiff required to show pretext *plus* some additional evidence of discrimination. *Id.* at 148, 120 S.Ct. at 2109. In other words, the Court may infer the ultimate fact of discrimination merely from the falsity of the employer's proffered explanation. *Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir.2000). Nevertheless, the plaintiff, at all times, bears the ultimate burden of persuasion with respect to the employer's alleged unlawful discrimination. *Texas Dep't Cmty. Affairs v. Bur-*

*dine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

■ In considering Plaintiff's prima facie case, the Court notes that Plaintiff has certainly met three of the four requisite elements of his prima facie case. As an African American, Plaintiff is a member of a protected class, which satisfies the first element. Plaintiff has also demonstrated that adverse employment actions were taken against him. Namely, Plaintiff was not promoted, endured several negative job performance evaluations, and was ultimately dismissed from Defendant's employ. These employment actions satisfy the second element of Plaintiff's prima facie case. Finally, with respect to the fourth element, Plaintiff alleges that others outside of the protected class were treated more fairly. (Pl.'s Dep., at 83–83.) Specifically, Plaintiff notes that Matt Bach, a fellow employee not within a protected class, was not reprimanded, as was Plaintiff, for the same act of using company postage for personal mail. (*Id.*, at 88.) Plaintiff also notes that Matt Bach arrived for work late and called in sick several times without incident, while Plaintiff was treated as if he abandoned his job when he missed work. (*Id.*, at 119–121.) Finally, Plaintiff points out that after his termination, his position was both temporarily and permanently filled with employees outside the protected class. (Pl.'s Br. Resp.Def.'s Mot.Summ.J., at 12.) When these facts are taken in the light most favorable to Plaintiff, the Court must conclude that Plaintiff has satisfied the first,

**3.** A showing of circumstances that create an inference of discrimination is often accomplished by demonstrating that employees outside of the protected class did not suffer the same disparate treatment. For example, an employee that is discharged may establish an inference of discrimination by showing that after his dismissal, either the position was filled with a similarly qualified individual not within the protected class or the employer held the position open and continued to seek applicants from similarly qualified candidates outside the protected class. *See Ennis v. Nat'l Ass'n of Bus. & Educ. Radio*, 53 F.3d 55, 58 (4th Cir.1995); *Gairola v. Commonwealth of Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1286 (4th Cir.1985).

second, and fourth elements of the *McDonnell Douglas* prima facie case. *See generally Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 ("The burden of establishing a prima facie case of disparate treatment is not onerous.").

With respect to the third element, that Plaintiff demonstrate that he was meeting his employer's legitimate expectations, however, the Plaintiff's offer of proof is not as convincing. Plaintiff argues that his 1997 evaluation actually rates his performance as "questionable" rather than unsatisfactory. (Pl.'s Br.Resp.Def.'s Mot. Summ.J., at 13.) Plaintiff's interpretation of the review appears to be misguided, however, as the cover-sheet to the review states that Plaintiff's status was questionable with respect to whether he should be retained at his current position. (*Id.,* at Ex. 22.) The substance of the review, as noted earlier, is more negative. Nowhere in his Brief in Response to Defendant's Motion for Summary Judgment does Plaintiff give any factual indication that he was performing at an acceptable level. Plaintiff simply claims that he was working at a satisfactory level and asserts that Defendant cannot prove otherwise. (*Id.,* at 12–13.)

Contrary to Plaintiff's contention that he was meeting his employer's legitimate expectations, several of Plaintiff's job performance evaluations over the course of his employment were negative. Plaintiff also received negative peer feedback regarding his work performance. As a result of a lack of improvement in Plaintiff's job performance after repeated reviews, he was placed on a PSP, which was a program aimed at regulating the quality of Plaintiff's output. Plaintiff admitted in his deposition, however, that he failed to meet several of the objectives outlined in the PSP. It was only after Plaintiff began to miss work unannounced that Defendant took the final step of terminating Plaintiff's employment. Even accepting Plaintiff's assertion that his work was satisfactory, questions remain as to whether Plaintiff has established that he met Defendant's legitimate expectations. However, given that the facts must be construed in favor of Plaintiff whenever possible, Plaintiff's proffer of evidence to establish that he was meeting his employer's expectations is sufficient to satisfy the requirements of Plaintiff's prima facie case and therefore withstands Defendant's motion for summary judgment at this stage. The Court, therefore, will proceed with a consideration of Defendant's explanation for its actions as required by the *McDonnell Douglas* analysis.

■ Based upon an assumption that Plaintiff has established his prima facie case, the burden would then shift to Defendant to articulate a legitimate, nondiscriminatory basis for its actions. *Hawkins v. PepsiCo, Inc.,* 203 F.3d 274, 278 (4th Cir.2000). Defendant's burden is one of production, requiring Defendant to merely proffer a legitimate reason for its employment decisions. *Id.* In its Reply to Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment, Defendant maintains that Plaintiff was not promoted and was unfavorably reviewed because he was not effectively performing his job. (Def.'s Br.Supp.Mot.Summ.J., at 18.) Defendant also states that Plaintiff was terminated not because of racial animus, but, rather, because he failed to meet the agreed upon milestones identified in the PSP and because of his behavior over the final two weeks of his employment. (Def.'s Reply Pl.'s Br.Resp.Def.'s Mot. Summ .J., at 9.) Defendant's explanations are tantamount to a claim that Plaintiff was not performing his duties and responsibilities to the satisfaction of his employer. The documents available to the Court

show that Plaintiff admitted missing several of the milestones. Plaintiff also received more than one negative job performance evaluation over the course of his employment. Moreover, it appears that just prior to his termination, Plaintiff missed several days of work and a meeting with his supervisor, while making little effort to advise his employers beforehand that he would be out. Therefore, the Court finds that the reasons proffered by Defendant sufficiently satisfy Defendant's burden of production, which requires it to articulate a legitimate, nondiscriminatory reason for the allegedly adverse employment actions taken against Plaintiff.

Once Defendant's burden of persuasion is satisfied, Plaintiff, in order to recover on his claims, is required to show that Defendant's proffered reasons are pretexts to discrimination. *Hawkins,* 203 F.3d at 278. In other words, Plaintiff must demonstrate that Defendant was actually and unlawfully motivated by race in his employment decisions. *Id.* As previously stated, Plaintiff claims that Defendant was motivated by race when it failed to promote Plaintiff, issued negative job performance evaluations, and ultimately fired Plaintiff. Plaintiff does not produce any evidence, however, that Defendant's proffered reason for these actions, that is, Plaintiff's poor job performance, is a pretext for discrimination.[4] Plaintiff makes no attempt to prove

that Defendant actually thought that Plaintiff was doing a satisfactory job or that they gave him a more favorable evaluation than they now submit. In fact, as stated before, Plaintiff actually admits that his supervisors perceived his work performance as being below standard. (Pl.'s Dep, at 135–37, 153–161.)

■■ Instead, with respect to the quality of his job performance, Plaintiff merely attempts to contradict Defendant's perception that Plaintiff was performing poorly. Specifically, Plaintiff now offers his own opinion, arguing that his job performance was, in fact, up to par. The Fourth Circuit has repeatedly held, however, that the perceptions of the employee are irrelevant in determining whether the employer's proffered reason was a pretext for discrimination. *Hawkins,* 203 F.3d at 280.[5] An employer is not required under 42 U.S.C. § 1981 to be economically altruistic and "'immunize protected class members from discharge' for performance-related reasons." *Id.* (quoting *Gairola v. Commonwealth of Virginia Dep't of Gen. Servs.,* 753 F.2d 1281, 1287 (4th Cir.1985)). In fact, when an employer gives a reason for declining to promote an employee, unfavorably reviewing an employee's work performance, or discharging an employee, it is not the Court's province "to decide whether the reason was wise, fair, or even cor-

4. Plaintiff's Brief in Response to Defendant's Motion for Summary Judgment, in discussing the pretext issue, quotes extensively from *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), before drawing the conclusion that it is "impossible to find that the Defendant's articulated reason stands uncontradicted and that there is no evidence of pretext." (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 17.) This assertion is not accompanied by any indication that Defendant's stated reason was not the actual reason for its decisions, though.

5. In *Hawkins,* Chief Judge Wilkinson, writing for the Fourth Circuit, noted that the plaintiff, "instead of producing evidence that shows [her employer's] assessment of her performance was dishonest or not the real reason for her termination—as the law requires—[the plaintiff] dispute[d] the merits of [her employer's] evaluations." *Hawkins,* 203 F.3d at 280. The Chief Judge continued, "[i]n doing so, [the plaintiff] can prove only the unremarkable fact that she and [her employer] disagreed about the quality of her work." *Id.* The Chief Judge concluded by stating that only the employer's perception of the quality of the employee's work was relevant. *Id.*

rect ... so long as it truly was the reason" for the employer's action. *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998) (quoting *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410–11 (7th Cir.1997)); *see Hawkins*, 203 F.3d at 279. Plaintiff has not provided the Court, though, with any evidence that Defendant's stated reasons for its employment decisions were not genuine.[6]

Plaintiff did, however, describe to the Court several incidents which he asserts amount to genuine issues of material fact. Specifically, Plaintiff asserts that there is a genuine issue of material fact with respect to whether Plaintiff acted in an insubordinate fashion when he left work to go home and rest after Mr. Ogorchock told him they would discuss his funeral plans later. (Pl.'s Br.Resp.Def.'s Mot.Summ.J., at 17–18.) Also, Plaintiff stated that there is a genuine issue of material fact regarding whether he contacted, or attempted to contact, Mr. Ogorchock to tell Mr. Ogorchock that he would miss work on March 18, 1998—a day during which the two individuals had scheduled an afternoon meeting. (*Id.*, at 18.) Finally, Plaintiff claimed that there are genuine issues of material fact in three additional regards: 1) whether he abandoned his job by removing his personal belongings from his office; 2) whether

Defendant failed to notify him of the possibility of procuring leave under the Family Medical Leave Act, 29 U.S.C. §§ 2601–2654; and 3) whether cancelling his email account was a constructive termination of his employment. (*Id.*, at 19.)

■ Plaintiff's multiple listing of various factual disputes between the parties is not enough to avoid summary judgment unless the factual disputes can be described as disputes that could affect the outcome of the litigation. *JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.2001) ("The existence of an alleged factual dispute ... will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation."). According to the *McDonnell Douglas* framework, Plaintiff cannot recover unless he carries his ultimate burden of proving that his employer acted on the basis of race. *See Hawkins*, 203 F.3d at 278. Therefore, Plaintiff's assertion of multiple issues of fact must be considered by the Court only if they relate to whether Defendant acted on the basis of race, such that Defendant's stated reasons for its actions were pretexts for acts constituting discrimination on the basis of Plaintiff's race.

---

**6.** Plaintiff does not create an issue of fact with respect to his level of performance by disputing Defendant's assessment of the quality of his work. "The existence of an alleged factual dispute between the parties will not defeat a properly supported motion for summary judgment, unless the disputed fact is one that might affect the outcome of the litigation." *JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir.2001). Because Plaintiff's self-assessment of his work abilities is irrelevant, he cannot rely on a self-created dispute with Defendant to create an issue of fact and thereby survive summary judgment.

The Court also notes that Plaintiff cannot manufacture an issue of fact sufficient to

avoid summary judgment by contradicting his own testimony. Plaintiff's deposition contains certain admissions regarding whether he completed some of the milestones identified in the PSP. Plaintiff's briefs, however, attempt to avoid these admissions. Although Plaintiff has not explicitly stated that this creates an issue of fact, to the extent that his argument can be read as asserting such, it fails to create an issue that can survive summary judgment. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir.1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

■ With respect to Plaintiff's first asserted issue of material fact—whether his behavior in attending the funeral was insubordinate—the Court is not influenced by Plaintiff's characterization of his actions. Previously in this Memorandum Opinion, in considering Plaintiff's claim that his job performance was acceptable, the Court noted that Plaintiff's own perceptions are irrelevant to the question of whether Defendant's actions were motivated by race. *Hawkins*, 203 F.3d at 280. That principle is also applicable in this context. The Court finds, therefore, that Plaintiff's own perceptions regarding whether his behavior was insubordinate are irrelevant. It is the employer's perception that matters. *Id.* Plaintiff's perceptions simply do not relate to the question of whether Defendant's actions were motivated by race. *Id.*

Plaintiff's second asserted issue of material fact, regarding whether Plaintiff attempted to contact Mr. Ogorchock, is also of little consequence. The question of whether Plaintiff attempted to contact his supervisor does not address the ultimate issue of whether Defendant's proffered reasons for its employment actions were the actual bases for not promoting Plaintiff, unfavorably reviewing Plaintiff's work, and ultimately terminating Plaintiff's employment. The same can be said of Plaintiff's other contentions which seek to raise issues of material fact. Whether Plaintiff abandoned his job by removing personal belongings from his office, whether Defendant failed to notify Plaintiff of his rights under the Family Medical Leave Act, and whether cancelling Plaintiff's email account was a constructive termination are all questions that do not relate to the ultimate issue in this case—whether Defendant's actions were motivated by race. Because none of these additional purported factual disputes address whether Defendant was motivated by race in its employment decisions, they simply do not affect the outcome of the case, and need not be considered by the Court.

Plaintiff, nevertheless, contends that all of these incidents, which he asserts are genuine issues of dispute, illustrate Defendant's attempt to exhibit somewhat harsher treatment toward Plaintiff. The Court, however, notes that workplace disagreements and incidents of occasional mistreatment are ordinary occurrences in a workplace. The Court, therefore, will not "impute a racial character to them based simply on [Plaintiff's] conjecture." *Id.* at 281 (declining to label as racist incidents where an employer told an employee that she was "not of the caliber" to be a manager, rejected her input at meetings, made fun of her personality, and failed to give her a gift at a company party).

For the reasons stated above, the Court finds that although Plaintiff has satisfied his prima facie case, he has failed to demonstrate that Defendant's proffered explanation for its employment decisions was a pretext for discrimination. The alleged issues of material fact that Plaintiff raised fail to show that Defendant's stated reason for terminating Plaintiff's employment, that is, that Plaintiff did not meet its legitimate job expectations, was false. Because the Court finds that there is no genuine issue of material fact with respect to whether Defendant's asserted basis for the employment actions directed at Plaintiff was a pretext for discrimination, summary judgment is proper with respect to Plaintiff's § 1981 claims.

2. Plaintiff's Second Cause of Action: State Law Wrongful Discharge

Defendant has also moved for summary judgment with respect to Plaintiff's second cause of action for wrongful discharge in violation of North Carolina's public policy as set forth in the Equal Employment

Practices Act, N.C.Gen.Stat. § 143–422.2. The statute states, in pertinent part:

> It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees. It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment foments domestic strife and unrest, deprives the State of the fullest utilization of its capacities for advancement and development, and substantially and adversely affects the interests of employees, employers, and the public in general.

N.C.Gen.Stat. § 143–422.2.

In *Coman v. Thomas Manufacturing Co.*, 325 N.C. 172, 175–76, 381 S.E.2d 445, 447 (1989), the North Carolina Supreme Court created an exception to the at-will employment doctrine when an employee is discharged in contravention of public policy. Presumably, Plaintiff relies upon the holding in *Coman* to support his second cause of action.

▉▉▉ Plaintiff, however, did not discuss his North Carolina state law claim for wrongful discharge in his Brief in Response to Defendant's Motion for Summary Judgment. For this reason, the Court notes that Plaintiff's inaction can be treated as an abandonment of that claim. In any event, to the extent that Plaintiff has not abandoned his state law claim, the Court finds that the standards that apply to claims under 42 U.S.C. § 1981 are identical to the standards that apply under North Carolina law. *Hawkins*, 203 F.3d at 282 ("We note further that the district court properly dismissed [the plaintiff's] state employment practices claims along with her § 1981 claims because the evidentiary standards for the state and federal claims are the same."); *Hughes v. Bedsole*, 48 F.3d 1376, 1383 (4th Cir.), *cert. denied*, 516 U.S. 870, 116 S.Ct. 190, 133 L.Ed.2d 126 (1995); *see also North Carolina Dep't of Corr. v. Gibson*, 308 N.C. 131, 136–37, 301 S.E.2d 78, 82–82 (1983) (adopting the federal standard, specifically the *McDonnell Douglas* test, for cases brought pursuant to N.C.Gen.Stat. § 143–422.2). Because the Court has determined that there is no genuine issue of material fact with respect to Plaintiff's claim under 42. U.S.C. § 1981, and the evidentiary standards for Plaintiff's § 1981 claim and Plaintiff's state law claim are the same, the Court also finds that there is no genuine issue of material fact with respect to Plaintiff's state law claim for wrongful discharge. Consequently, the Court finds that summary judgment is also proper as to the state law claim that Plaintiff has asserted pursuant to N.C.Gen.Stat. § 142–422.2.

## IV. CONCLUSION

For the reasons stated above, the Court finds that there are no genuine issues of material fact with respect to both Plaintiff's claim under 42 U.S.C. § 1981 and Plaintiff's wrongful discharge claim under North Carolina state law. Therefore, Defendant's Motion for Summary Judgment [Document # 19] is hereby GRANTED. An Order and Judgment in accord with this Memorandum Opinion shall be filed contemporaneously herewith.

## *ORDER AND JUDGMENT*

For the reasons stated in the Court's Memorandum Opinion, filed contemporaneously herewith, it is hereby ORDERED, ADJUDGED AND DECREED that Defendant's Motion for Summary Judgment

[Document # 19] is GRANTED and all claims against it are DISMISSED.