UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JAMISA JOHNSON,
             *Plaintiff-Appellant,*

v.

TOYS "R" US - DELAWARE,
INCORPORATED, d/b/a Toys "R" Us,
a/k/a Toys "R" Us, Incorporated,
             *Defendant-Appellee,*

and

JANE DOE, Employee and/or agent of
Toys "R" Us - Delaware,
Incorporated, also known as Toys
"R" Us, Incorporated; JOHN DOE,
Employee and/or agent of Toys "R"
Us - Delaware, Incorporated, also
known as Toys "R" Us,
Incorporated,

             *Defendants.*

No. 02-1986

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Walter E. Black, Jr., Senior District Judge.
(CA-01-1283-B)

Argued: January 21, 2004

Decided: February 23, 2004

Before WILKINSON, MICHAEL, and SHEDD, Circuit Judges.

Affirmed by unpublished per curiam opinion. Judge Michael wrote a
concurring opinion.

**COUNSEL**

**ARGUED:** Boniface Kwesi Cobbina, Washington, D.C., for Appellant. Ronald McGlenn Cherry, Towson, Maryland, for Appellee.

---

**OPINION**

PER CURIAM:

Jamisa Johnson appeals the district court's grant of summary judgment in favor of Toys "R" Us Delaware, Inc. as to her race discrimination and defamation claims.[1] Johnson alleges that Toys "R" Us violated 42 U.S.C. § 1981 when it deactivated the gift cards she purchased at the Toys "R" Us store in Laurel, Maryland. The district court granted summary judgment in favor of Toys "R" Us on this claim, ruling that Johnson failed to establish — either through direct evidence or a *McDonnell Douglas* prima facie case — that Toys "R" Us discriminated against her because she is an African-American. Johnson further alleges that Toys "R" Us defamed her by informing some of her superiors and co-workers that the gift cards were stolen. The district court granted summary judgment on this claim, ruling that the statements made by Toys "R" Us were protected by a conditional privilege. We affirm the judgment of the district court.

I.

In November 2000, Johnson was employed at a Home Depot store near Laurel, Maryland.[2] She was put in charge of purchasing several thousand dollars' worth of gifts for the Home Depot holiday party scheduled for December 10. Johnson was given an American Express

---

[1] Johnson also asserted claims for breach of contract and negligent hiring and retention of employees. Johnson does not appeal the district court's judgment as to these claims.

[2] Because we are reviewing a grant of summary judgment in favor of Toys "R" Us, we view all of the evidence in the light most favorable to Johnson. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

corporate card in her name with a $12,000 limit to make the necessary purchases for the party.

On November 29, Johnson, accompanied by her fellow employee, Elsie Craig, who is also an African-American, began shopping for the party. One of the first stores Johnson and Craig patronized was the Toys "R" Us in Laurel. While there, they decided to buy four video game systems totaling about $540. They went to the cash register where they told the cashier which game systems they wanted to buy and also requested forty-two gift cards. Each card had a face value of $10, for a total of $420. The cashier prepared the gift cards and presented them to Johnson, and then the cashier directed Johnson and Craig to the pick-up counter where they could claim their four video game systems. The entire transaction at the cash register was routine and unremarkable.

Johnson and Craig proceeded to the pick-up counter where they were met by a clerk who took Johnson's receipt, went through a door to retrieve the purchased merchandise, and returned with the four video game systems. After this employee returned with the merchandise, Tammy Main, a white Toys "R" Us supervisor,[3] rushed over to the pick-up counter. Main looked at Johnson's receipt and told the other employee that she was giving Johnson the wrong merchandise. Main picked up one of the video game systems and headed towards the stockroom. Before reaching the door, Main turned around, returned the same game system to the employee, and stamped the receipt received. After Main and the other employee bagged the games, Johnson and Craig left the store with all the merchandise and gift cards they purchased. Both Johnson and Craig were unsettled by how Main treated them. They felt that Main had implicitly accused them of some sort of wrongdoing.

On December 10, Home Depot held their holiday party. During the party, management raffled off the more than $10,000 in gifts that Johnson had purchased, including the Toys "R" Us gift cards, to the Home Depot employees. Among others, Katina Curry and Ron Dietz,

---

[3]The parties dispute whether Main was a supervisor. The dispute is immaterial to our opinion. We will assume that Main was a supervisor.

Johnson's supervisors, and Juan Morgan, Johnson's co-worker, received several Toys "R" Us gift cards.

Within hours after the party, Curry called the toll-free telephone number on the back of her gift cards to find out their value. The cards did not show a monetary value on their faces. Curry was informed that the cards were stolen.

The next day, December 11, Morgan's wife attempted to purchase toys for her children at Toys "R" Us using several gift cards that her husband received at the party. The cashier told her that the cards were stolen. A policeman came to the register, and the gift cards were confiscated. To avoid further embarrassment in front of her children, Morgan's wife paid for the toys with her own money.

Later that same day, Morgan reported what happened to his wife at Toys "R" Us to Dietz, a Home Depot assistant manager. Dietz called to find out the status of the gift card he received and was told the card was stolen. Dietz summoned Johnson to his office. When Johnson arrived, Morgan accused her of giving out stolen gift cards.

Johnson promptly telephoned the Laurel Toys "R" Us store to find out why the cards were being reported stolen. The operator forwarded Johnson's call to Main, the same supervisor who checked Johnson's receipt at the pick-up counter on the day Johnson made her purchases. Johnson told Main that the gift cards had been reported stolen. Main asked for the identification numbers on the sales receipt and the gift cards. After Johnson gave her the requested information, Main told Johnson that she would look into the problem and call her back. Johnson told Main that she would come to the store immediately.

Johnson soon arrived at the store and went directly to the service desk where she asked to speak to a member of management. Main came to the service desk and asked to see Johnson's receipt and credit card. Main told Johnson that she needed to speak to an American Express representative about her account. Main dialed the American Express number and handed the phone to Johnson. The American Express representative researched the account and told Johnson that he saw nothing wrong with the credit card and that he did not know why the gift cards were deactivated.

With the American Express representative still on the phone, Johnson handed the phone back to Main. Main then transferred the call so that she could talk to the American Express representative in her office. As Main left the service desk, Stephanie Ross, an African-American employee at the service desk, stated to another African-American female employee: "[I]t's a shame that they do this to us all the time." J.A. 138. Johnson did not ask Ross what she meant. Johnson was not included in their conversation and was not focusing on it. Nevertheless, Johnson contends that the two African-American women were talking about Main's poor treatment of African-American customers. In an affidavit, Ross admitted making the statement but explained that she meant that it was a shame how "customers" are always complaining to Toys "R" Us about questionable transactions. J.A. 453.

Main eventually returned with Wally Peters, one of the managers on duty. Peters is white. Johnson remembered seeing Peters at Toys "R" Us the day she purchased the gift cards. Johnson asked Peters why the gift cards were deactivated. Peters said that the cards were deactivated because Johnson "looked suspicious." J.A. 124. When Johnson asked what made her look suspicious, Peters did not answer but instead offered to allow Johnson to choose a gift of up to $75 for Morgan's children. Johnson telephoned Morgan to ask what gift he would like. Johnson found that gift and also bought another gift for her own child. Toys "R" Us reactivated all the gift cards Johnson purchased and gave her twelve extra gift cards to take the place of any that may have been discarded by the Home Depot employees once they found out the cards had no value. Johnson used some of the reactivated cards to buy the gift for her child. Johnson was at the Laurel Toys "R" Us store for one or two hours on December 11 getting the gift cards reactivated and buying presents.[4]

---

[4]Johnson claims that it should not have taken this long for Toys "R" Us to reactivate the forty-two gift cards. She claims that this long wait is circumstantial evidence that Toys "R" Us discriminated against her based on her race. We conclude that no reasonable factfinder could infer racial discrimination based upon the length of time Johnson was in the store on December 11.

Based on these facts, Johnson contends that Main and Peters decided to deactivate the cards shortly after she purchased them on November 29 because she is an African-American. Johnson emphasizes in particular the rude treatment she received from Main at the pick-up desk the day Johnson made her purchases and Peters's statement that the cards were deactivated because Johnson "looked suspicious."

In response, Toys "R" Us contends that neither Main nor Peters was involved in deactivating the gift cards. Main testified that she has no recollection of encountering Johnson at the pick-up counter the day she purchased the merchandise. Both Main and Peters testified that they had nothing to do with the cards being deactivated.

Instead, Toys "R" Us claims that officials in its Money Counting and Loss Prevention offices — none of whom knew that Johnson is an African-American — were the only officials at Toys "R" Us involved in deciding to deactivate the gift cards Johnson purchased. Sue Davis, a money counter at Toys "R" Us, testified that she first noticed Johnson's transaction the morning of November 30, the day after Johnson made her purchase, during her "FAST" — Financial Accountability of Sales Transactions — review.[5] In that review, Davis ensures that the receipts for the previous day's transactions balance with the cash register money bags. She also looks through the credit card receipts for any unusual transactions. A few weeks before the incident in question, Davis received an internal memorandum informing her of recent fraudulent purchases of gift cards by credit card and requiring her to scrutinize any such purchases of more than $250. Upon finding Johnson's transaction, Davis telephoned Steve Burd at the Toys "R" Us Loss Prevention office in Frederick, Maryland to report it. Burd directed Davis to contact American Express to see if Johnson's card had been reported lost or stolen. As directed, Davis telephoned American Express and was told that the card was recently issued but had not been reported lost or stolen. Davis asked the American Express representative to telephone the cardholder to inquire whether the Toys "R" Us purchase was valid. The representative attempted to contact Johnson but reported to Davis that her efforts

---

[5]Attendance records show that Davis did not work at the Laurel store on November 29, the day Johnson made her purchases.

were unsuccessful. Davis relayed this information to Burd, who asked Davis to wait a few hours and then check back with American Express. In her second telephone call to American Express, Davis was told that Johnson had a nonworking number and that directory assistance had no number for her.

Davis again reported to Burd the information she received from American Express. Based on this information, Burd felt there was a possibility of fraud and decided to deactivate Johnson's gift cards until her American Express purchase could be verified as valid.

To deactivate the cards, Burd contacted ValueLink, the third party contractor that Toys "R" Us hired to administer the gift card program. Each gift card has ValueLink's toll-free number on the back. By deactivating the cards, Burd knew that ValueLink would inform any callers that the gift cards purchased by Johnson had been reported lost or stolen. Burd also asked ValueLink to give his cell phone number to any caller; Burd hoped that a caller would contact him so that he could make further inquiry as to whether Johnson's purchase was valid. If so, Burd would have the gift cards reactivated.

## II.

We review the grant of summary judgment de novo. *JKC Holding Co. v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). Summary judgment is appropriate when the admissible evidence demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Proc. 56(c). In reviewing the evidence, the court must draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence. *Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 656 (4th Cir. 2002). Although all reasonable inferences must be drawn in favor of the nonmoving party, such inferences must "fall within the range of reasonable probability and not be so tenuous as to amount to speculation or conjecture." *Thompson Everett, Inc. v. National Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).

## III.

We first address Johnson's race discrimination claim. Section 1981 grants all persons within the jurisdiction of the United States "the

same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). As in other types of discrimination lawsuits, a plaintiff may seek to prove a § 1981 cause of action either by direct evidence or by the judicially created burden-shifting proof scheme originally set out by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See United States Postal Serv. v. Aikens*, 460 U.S. 711, 714 n.3 (1983) (Title VII case); *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 278 (4th Cir. 2000) (§ 1981 case). Johnson argues that she can establish the required elements of her discrimination claim through both direct evidence and through the familiar *McDonnell Douglas* burden-shifting framework.

A.

When the plaintiff seeks to prove her case by direct evidence, she must establish her prima facie[6] case by showing through admissible evidence that: (1) she is a member of a racial minority; (2) the defendant intended to discriminate against her on the basis of race; and (3) the discrimination concerned a privilege protected under § 1981. *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001). In a direct evidence case, the plaintiff may meet her burden by the ordinary principles of proof using any direct or indirect evidence so long as the evidence is relevant to and sufficiently probative of the issue in question. *Goldberg v. B. Green and Co.*, 836 F.2d 845, 847 (4th Cir. 1988). Johnson must, therefore, "produce direct evidence of a stated purpose to discriminate and/or circumstantial evidence of sufficient probative force to reflect a genuine issue of material fact." *Id.* at 848.

It is undisputed that Johnson has presented sufficient evidence of the first and third elements. As an African-American, she is a member of a protected racial class. Also, by deactivating the gift cards, Toys

---

[6]As the Supreme Court has explained, "prima facie" can have more than one meaning. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 n.7 (1981). We use the phrase in the direct evidence context to "describe the plaintiff's burden of producing enough evidence to permit the trier of fact to infer the fact at issue." *Id.* When we use the phrase in the *McDonnell Douglas* context, we mean "the establishment of a legally mandatory, rebuttable presumption." *Id.*

"R" Us deprived her of the benefits and privileges of having entered into the agreement to pay for the gift cards in return for the right to present them later for the purchase of goods and services.

The only issue before us is whether Johnson adduced sufficient evidence establishing that Toys "R" Us deactivated the gift cards based on her race. In her appellate brief, Johnson argues that there is only one piece of direct evidence — the alleged statement by Peters that Toys "R" Us deactivated the cards because Johnson "looked suspicious." J.A. 124.[7] Although Peters denies that he made such a statement, for purposes of summary judgment we must accept Johnson's testimony as true and determine whether a jury could reasonably infer from Peters's statement that Toys "R" Us deactivated the gift cards because Johnson is an African-American.

We conclude that the statement "you looked suspicious" is too speculative to support a conclusion that Toys"R"Us deactivated the gift cards based on Johnson's race. Evidence is too speculative if the factfinder cannot rationally choose between mere "possibilities" of meanings. *DeJarnette*, 133 F.3d at 298; *Abady v. Hanover Fire Ins. Co.*, 266 F.2d 362, 364 (4th Cir. 1959) ("[I]t is well settled that the trier of fact will not be allowed to guess or speculate on mere possibilities, but must be furnished with probabilities."). Although Peters's comment could have meant what Johnson suggests, it is equally possible that Peters found it suspicious for a female to be purchasing video game systems or for anyone to be purchasing forty-two gift cards and four video game systems at one time. Without more evidence suggesting a racial meaning, the factfinder would be left to guess at the meaning of Peters's statement.

---

[7]In rebuttal at oral argument, counsel for Johnson argued for the first time on appeal that Ross's statement that "they treat us like this all the time" is also direct evidence of discrimination. This argument is meritless. First, we deem the argument abandoned because it was not argued in Johnson's appellate brief. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 241 n.6 (4th Cir. 1999). Second, the statement is too speculative. The factfinder would have no rational basis to choose from among several possible meanings of the statement. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 298 (4th Cir. 1998).

We faced a similar scenario in *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280-81 (4th Cir. 2000), where the plaintiff's supervisor told her that she was "not of the caliber" to warrant promotion. The plaintiff interpreted this statement to mean that she was not eligible for promotion because of her race. We found this statement too speculative and declined to "impute a racial character to [the defendant's statement and conduct] based simply on the [plaintiff's] conjecture." *Id.* at 281. We also conclude in this case that Johnson's interpretation of Peters's statement is too speculative to allow a jury to rationally decide that Toys "R" Us discriminated against her based on her race. Therefore, the district court properly ruled that Johnson failed to present direct evidence of racial discrimination.

B.

We next decide whether Johnson has presented sufficient evidence to prevail under the *McDonnell Douglas* burden-shifting framework. Under this framework, the plaintiff must first establish a prima facie[8] case of discrimination, the defendant may respond by producing evidence that it acted with a legitimate, nondiscriminatory reason, and then the plaintiff may adduce evidence showing that the defendant's proffered reason was mere pretext and that race was the real reason for the defendant's less favorable treatment of the plaintiff. *Murrell v. The Ocean Mecca Motel, Inc.*, 262 F.3d 253, 257 (4th Cir. 2001) (§ 1981 case); *Hawkins*, 203 F.3d at 278. Although the respective evidentiary burdens shift back and forth under the framework, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253; *Murrell*, 262 F.3d at 257.

In her brief, Johnson does not cite any authority or list the elements she must establish to properly assert a § 1981 prima facie case under the *McDonnell Douglas* framework. We, nevertheless, will assume arguendo, *see Hawkins*, 203 F.3d at 278, that Johnson has made out a *McDonnell Douglas* prima facie case and will instead proceed to

---

[8]As we previously noted, "prima facie" in this particular context means "the establishment of a legally mandatory, rebuttable presumption." *Burdine*, 450 U.S. at 254 n.7.

determine whether Toys "R" Us has met its burden of presenting admissible evidence of a legitimate, nondiscriminatory reason for deactivating the gift cards and, if so, whether Johnson has sufficiently shown that this offered reason is really pretext for discrimination.

To meet its burden, Toys "R" Us must clearly set forth, through the introduction of admissible evidence, a legitimate, nondiscriminatory reason for deactivating the gift cards purchased by Johnson. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)(ADEA case); *Aikens*, 460 U.S. at 714; *Murrell*, 262 F.3d at 257. This is a burden of production, not persuasion. *Reeves*, 530 U.S. at 142.

Toys "R" Us produced evidence showing that the decision to deactivate the gift cards was made by individuals in the Money Counting and Loss Prevention departments who had never seen Johnson and did not know that she is an African-American. Davis in Money Counting had received an internal memorandum instructing her to investigate high dollar purchases of gift cards by credit card. She contacted Burd in Loss Prevention, who set in motion the telephone calls to American Express in hopes of contacting Johnson to determine if the transaction was valid. Only after Burd was informed that American Express had a nonworking telephone number and directory assistance had no listing for Johnson did he decide to deactivate the cards. This reason, if believed by the factfinder, would prove that the decision to deactivate the gift cards had nothing to do with Johnson's race.

Having concluded that Toys "R" Us has offered a legitimate, nondiscriminatory explanation for deactivating the gift cards, the presumption of discrimination raised by the assumed prima facie case is rebutted and drops from the case. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993)(Title VII case). The sole remaining issue becomes whether there is a genuine issue of material fact that Toys "R" Us deactivated the gift cards because Johnson is an African-American. *See Reeves*, 530 U.S. at 142-43. Johnson may meet this burden by showing that the reason proffered by Toys "R" Us is not credible. *See id.*, at 143. Moreover, in some circumstances, "the trier of fact can reasonably infer from the falsity of the [defendant's]

explanation that the [defendant] is dissembling to cover up a discriminatory purpose." *Id.* at 147.

Johnson contends that the employees in Money Counting and Loss Prevention really had no good reason to deactivate the gift cards based on their independent investigation. Thus, their decision to deactivate the cards was unreasonable and shows that it was really Main and Peters who influenced them to deactivate the cards based on the fact that Johnson is an African-American.

This argument lacks merit for at least two reasons. First, there is no evidence that Main and Peters had any contact with the Money Counting and Loss Prevention employees about Johnson's purchase.[9] There is no evidence that Main and Peters had authority to or knew how to deactivate the gift cards on their own. Instead, the undisputed evidence is that Burd, without any input from Main or Peters and without knowing that Johnson is an African-American, ultimately decided to deactivate the gift cards based on his suspicion of fraud.

Second, Johnson's theory of pretext suggests, at most, that it was unreasonable for Loss Prevention to deactivate the cards. In determining pretext in discrimination cases, courts are not called on to decide whether the defendant's conduct toward the plaintiff is reasonable, wise, or even fair; instead, courts must decide whether there is sufficient evidence showing that the proffered reason for the conduct is a dishonest one. *See DeJarnette*, 133 F.3d at 299. Based on the record and arguments before us, Johnson has failed to adduce any evidence suggesting that the nondiscriminatory reason proffered by Toys "R" Us is false. Therefore, the district court properly ruled that Johnson

---

[9]Johnson argues that a reasonable jury could infer that Main reported Johnson's purchase of gift cards to Loss Prevention the day Johnson purchased them. She bases this assertion on Main's testimony that "[a]nything to do with value cards usually we get [Loss Prevention] involved." J.A. 213. This assertion takes Main's statement out of context. Main testified that she contacted Loss Prevention right after Johnson called on December 11 claiming that she had a "huge problem" with the gift cards. It is clear that Main would contact Loss Prevention whenever a customer complained about a problem with gift cards, not that she would contact Loss Prevention whenever any customer purchased gift cards.

failed to establish her discrimination claim through the *McDonnell Douglas* burden-shifting framework.

IV.

Johnson next summarily argues that the district court erred in granting summary judgment in favor of Toys "R" Us as to her Maryland state law defamation per se claim. She claims that Burd acted with malice when he directed ValueLink, the third-party gift card administrator, to inform those who called the gift card toll-free number that the cards purchased by Johnson had been reported stolen. Johnson contends that Burd had no reason to think that Johnson's purchase was suspicious and knew that the cards had not been reported stolen.[10]

The district court ruled that (1) Toys "R" Us was covered by a conditional privilege for the alleged defamatory statements it made; and (2) Johnson failed to overcome this privilege by showing that Toys "R" Us acted with malice. On appeal, Johnson does not contest that the conditional privilege applies. Instead, Johnson argues only that she has adequately demonstrated that Toys "R" Us acted with malice.

A plaintiff may overcome the conditional privilege by showing the defendant acted with malice. *Marchesi v. Franchino*, 387 A.2d 1129, 1133 (Md. 1978). To establish malice, Johnson must show that Burd knew that the gift cards were not stolen or acted with reckless disregard as to the truth when he directed ValueLink to inform callers that the cards were stolen. *See DeLeon v. Saint Joseph Hospital, Inc.*, 871 F.2d 1229, 1238 (4th Cir. 1989) (applying Maryland law). Knowing falsity or reckless disregard for the truth involves proof of a firm belief that the statement is probably false such that the defendant had serious doubts as to whether his statement was true. *Hohman v. A.S. Abell Co.*, 44 Md.App. 193, 200 (Md. Ct. Spec. App. 1979).

---

[10]Burd knew that the cards had not been "reported" stolen. Whether the cards were "reported" stolen, however, is not what potentially makes the statement defamatory. What makes the ValueLink message potentially defamatory is that it suggests that Johnson might have stolen them.

We agree with the district court that no reasonable jury could find, even when viewing the evidence in the light most favorable to Johnson, that Burd acted maliciously as defined by Maryland law. Although Burd did not know whether the gift cards were stolen when he deactivated them, it is clear that Burd suspected that they might have been stolen via credit card fraud. Thus, Burd did not have a firm belief that the ValueLink message — informing the callers that the cards were stolen — was probably false. Instead, he suspected the statement might be true. Moreover, Burd did not act in reckless disregard of the truth. Before deciding whether to deactivate the cards, he directed Davis to wait a few hours before contacting American Express a second time. He decided to deactivate the cards only after he learned that American Express had a nonworking number for Johnson. Thus, Burd based the published statement on a reasonable suspicion that the cards were stolen. Moreover, he took steps to ameliorate any potential harm if it turned out the cards were not stolen by leaving his cell phone number for those who attempted to use the gift cards Johnson purchased. Therefore, we conclude that the district court properly granted summary judgment as to Johnson's defamation claim.

## V.

For the foregoing reasons, we affirm the district court's entry of summary judgment in favor of Toys "R" Us as to Johnson's discrimination and defamation claims.

*AFFIRMED*

MICHAEL, Circuit Judge, concurring:

I concur in the judgment and in all of the majority opinion except part III.A. I write separately to explain my reason for concluding that Johnson has not presented any direct evidence that Toys "R" Us discriminated against her because of her race. Johnson argues that the statement of Wally Peters, a store manager, that the gift cards were deactivated because Johnson "looked suspicious" is direct evidence of discriminatory intent. Johnson, however, presents no evidence that Peters played any part in the decision to deactivate the gift cards, as part III.B of the court's opinion explains. Because Peters is not tied

to the deactivation of the cards, I agree that his statement that Johnson "looked suspicious" is not direct evidence of Toys "R" Us's intent to discriminate.

I do not agree, however, that Wally Peters's statement would be too speculative to allow a jury to infer racial animus on Peters's part if his intent was relevant. Johnson testified in her deposition, "I spoke to Wally. I don't know his last name. And he said that I looked — I asked him why were the cards deactivated, and he said I looked suspicious." J.A. 124. Johnson further testified:

> My conversation to Wally was why were the gift cards deactivated and, in turn, he said you looked suspicious. I said, What looked suspicious? And then he said that they were going to give me a $75 purchase, one item or less. I said — because I had asked him what looked suspicious and that is when he just changed the subject and said, We will give you $75, one item or less.

J.A. 158-59. There is no direct explanation in the record as to why Peters believed that Johnson looked suspicious. However, when Johnson, an African-American, pressed Peters to tell her why she looked suspicious, Peters quickly changed the subject and offered Johnson seventy-five dollars in free merchandise. In addition, Peters's explanation to Johnson that the cards were deactivated because she "looked suspicious" contradicts Toys "R" Us's explanation that the cards were deactivated because the transaction might have been fraudulent. Peters did not make an explicit reference to Johnson's race, but that would not have been necessary. Johnson could have avoided the *McDonnell Douglas* framework by offering sufficient direct or circumstantial evidence of discrimination. *Goldberg v. B. Green & Co.*, 836 F.2d 845, 847-48 (4th Cir. 1988). If the evidence had tied Peters to the deactivation of the cards, a jury could have inferred an intent to discriminate from Peters's reference to Johnson's suspicious appearance and other circumstantial evidence.

*Hawkins v. Pepsico, Inc.*, 203 F.3d 274 (4th Cir. 2000), does not require the conclusion that Peters's "you looked suspicious" statement is too speculative to be evidence of discrimination. The plaintiff in *Hawkins* alleged that her supervisor created a racially hostile work

environment and terminated her because of her race. In *Hawkins* the supervisor repeatedly criticized the employee, and that alone, we said, did not allow an inference of racial animus. *Id.* at 277, 280-81. We characterized the criticism as an "ordinary occurrence[ ] in a workplace setting," and "[w]e decline[d] to impute a racial character" to it. *Id.* at 281. Peters's statement is more probative of discriminatory intent for several reasons. It refers to Johnson's appearance, and it contradicts Toys "R" Us's later explanation. Furthermore, it is surely unusual for a store manager to tell a customer that the store deactivated her gift cards because she "looked suspicious" and then quickly change the subject, offering free merchandise, when the customer presses him to explain his statement. Again, because Peters had no role in the deactivation of the cards, his statement about Johnson is not evidence that Toys "R" Us discriminated against her when it deactivated the cards she purchased.