**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 04-2021**

—————————

LINWOOD Q. HAM, SR.; BENJAMIN PORTER; ANDRE
PROCTOR,

                                  Plaintiffs - Appellants,

        versus

WASHINGTON SUBURBAN SANITARY COMMISSION,

                                  Defendant - Appellee.

—————————

Appeal from the United States District Court for the District of
Maryland, at Greenbelt.  Roger W. Titus, District Judge.  (CA-03-
1036-RWT)

—————————

Argued:  September 22, 2005          Decided:  December 21, 2005

—————————

Before TRAXLER and GREGORY, Circuit Judges, and R. Bryan HARWELL,
United States District Judge for the District of South Carolina,
sitting by designation.

—————————

Affirmed in part, reversed in part, and remanded by unpublished
opinion.  Judge Gregory wrote the opinion, in which Judge Harwell
joined.  Judge Traxler wrote a separate opinion concurring in the
judgment.

—————————

**ARGUED:** Donald Melvin Temple, Washington, D.C., for  Appellants.
Elizabeth Torphy-Donzella, SHAWE & ROSENTHAL, L.L.P., Baltimore,
Maryland, for Appellee.  **ON BRIEF:** Bruce S. Harrison, Darryl G.
McCallum, SHAWE & ROSENTHAL, L.L.P., Baltimore, Maryland, for
Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

GREGORY, Circuit Judge:

Benjamin Porter, Andre Proctor, and Linwood Ham, Sr. (collectively "Appellants"), African-American employees of the Washington Suburban Sanitary Commission ("WSSC"), appeal from the United States District Court for the District of Maryland's grant of summary judgment in favor of WSSC. Appellants allege that WSSC denied them promotions on the basis of race, in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) and 42 U.S.C. § 1981. Because we believe Appellants Porter and Proctor have produced sufficient evidence from which a jury could conclude that WSSC's proffered reasons for failing to promote them were pretext for discrimination, we reverse the district court's grant of summary judgment as to them. We hold, however, that summary judgment was appropriate with respect to Appellant Ham.

I.

Following is a recitation of facts as construed in the light most favorable to Appellants, the nonmovants for summary judgment.[1] WSSC provides water and sewer services to 1.6 million residents in Montgomery County and Prince George's County, Maryland and employs

---

[1]On a motion for summary judgment "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255 (1986).

approximately 1,500 people. J.A. 1747. As of December 2003, minorities comprised over 51% of the WSSC workforce. Id. at 1748.

In July 2000, WSSC underwent a major reorganization in which its Operations Bureau and its Electrical and Mechanical ("E&M") Section merged into one body called the Production Team. Previously, the Operations Bureau was responsible for operating the water and waste water equipment at WSSC plants, while the E&M Section inspected, repaired, and maintained the equipment at plants and pumping stations. The Production Team thus combined two individual workgroups into a single organization to be led by a Lead Electrical/Mechanical Technician ("Lead Tech") at each of the WSSC facilities. This, and other reorganizational efforts at WSSC resulted in the elimination of more than 600 jobs between 1997 and 2003.

The restructuring and concomitant retirements culminated in seven Lead Tech openings at WSSC's plants, four of which are relevant here.[2] Between July and October 2000, WSSC internally

---

[2]Between 2000 and 2002, Lead Tech positions became available at the Anacostia, Parkway, Patuxent, Piscataway, Potomac, Seneca, and Western Branch facilities. Appellants do not challenge their nonselection at Anacostia or Patuxent. They allege, however, that they were prejudiced with regard to selection at Anacostia because they believe the Anacostia job posting was tailored to the abilities of the person selected. Appellants could not compete for the Patuxent Lead Tech position as the hiring official at Patuxent did not post a job opening and simply promoted the person then serving as Acting Lead Tech to Lead Tech. This practice was permitted under WSSC policy. Finally, we decline to entertain Appellants' challenges to the promotion decision at Parkway. The district court granted summary judgment with respect to the Parkway

4

publicized available Lead Tech positions at its various facilities. In advertising the Lead Tech positions, each facility excerpted WSSC's single, published Lead Tech position description, which indicated that a Lead Tech performs the following essential functions:

> Directs and assigns subordinate Electrical/Mechanical Technicians, Electrical Mechanics, and helpers in the installation, repair, or modification of various types of equipment, systems, and devices;
>
> Oversees or takes the lead in the more difficult electrical or mechanical maintenance activities;
>
> Installs pumps, motors, pipes, valves, and electrical controls necessary to make a new pumping unit functional;
>
> Determines nature and extent of repairs and work sequences;
>
> Repairs motor control switchboards and equipment up to 5KV including synchronous motors and variable speed controls;
>
> Repairs substation equipment up to 69 KV including oil circuit breakers and transformers;
>
> Installs, maintains, repairs, and tests electrical systems, electric shop equipment and internal electrical power distribution facilities;
>
> Repairs pneumatic and hydraulic control systems on valves and bubbler systems;
>
> Installs a wide variety of other electrical or mechanical equipment.

---

Plant because of Appellants' failure to file their charge with the EEOC in a timely fashion. J.A. 1616. As Appellants do not here contest the district court's timeliness determination, we find that they have waived their ability to challenge the district court's grant of summary judgment with regard to the Parkway Plant.

J.A. 1762. The position description made no mention of a need for administrative skills, writing abilities, or the ability to advocate the Total Productive Operations Initiative ("TPO Initiative").[3] It did, however, specify a minimum number of years of experience in electrical/mechanical work or an equivalent combination of skills and experience. Id.

Appellants collectively submitted eight applications for the Lead Tech positions at WSSC's Piscataway, Potomac, Seneca, and Western Branch facilities through WSSC's internal promotion program. Ham applied at each of the four facilities, Porter at two, and Proctor at two.

At the time of the promotion decisions, Porter had been employed at WSSC for twenty-two years. During that time, Porter worked as an Electrical/Mechanical Technician at the Piscataway and Anacostia facilities. In January 1998, Porter's supervisor selected Porter to serve as Acting Lead Tech at the Anacostia Depot. During his thirty-three month stint as Acting Lead Tech, Porter successfully performed all the responsibilities of a Lead

---

[3]In connection with the merger of the Operations Bureau and E&M Section, WSSC instituted the TPO Initiative, which endeavored to train "flexible workers" capable of performing tasks that fit traditionally within both the E&M Section and the Operations Bureau. Supp. J.A. 2444. Thus, WSSC maintained that the Lead Tech "would be called upon to . . . promote the TPO Initiative and 'flexible worker' program and communicate this program to the staff at the plants." Id. at 2444-45.

Tech and received the highest overall performance rating.[4]  Porter was serving as Acting Lead Tech when he applied for the permanent Lead Tech positions.

At the time of the hiring decisions, Appellant Proctor was in his twenty-forth year at WSSC, having spent all but four months at the Piscataway Plant.  He began working at WSSC in November 1976 as an Electrical Mechanic Helper and was later promoted to Electrical/Mechanical Technician.  For nine months in 2000, Proctor served as Acting Lead Tech at the Piscataway Plant.  During that time, the Piscataway Plant's nonmanagement personnel elected Proctor an E&M Subject Matter Expert, responsible for assessing whether employees displayed mastery of particular skills and for assisting with employee training.  J.A. 1236-39.

When Ham applied for the Lead Tech positions, he had worked at WSSC for nine years.  Before arriving at WSSC in 1991, Ham performed electrical field work while in the U.S. Marine Corps and worked for several electrical contractors.  At the time he applied for the Lead Tech position, he was an Electrical Inspector in the E&M Section.  In that capacity, he supervised contractors at various plants and facilities, and therefore developed a working

---

[4]From 1999-2000, Porter earned the highest overall rating of "superior."  J.A. 1173-74.  In 1997-1998, he received the next highest overall rating of "commendable."  Id. at 1175-76.  His 1998-1999 evaluation is not included in the record.  Although these evaluations were overwhelmingly positive, supervisors suggested Porter's written expression could use improvement.

knowledge of the various WSSC facilities. J.A. 404. Ham was consistently praised for his technical skill, but simultaneously critiqued for his allegedly "abrasive" communication style.

WSSC did not select any of the Appellants for the Lead Tech positions, instead filling each position (including the Anacostia and Patuxent positions) with Caucasian candidates. WSSC selected Randy Clark for the Lead Tech position at the Piscataway Plant. Clark had been with WSSC for nearly twenty years. Chris Barnhill, who had six years of experience at WSSC, was selected for the Lead Tech position at Western Branch. WSSC selected Carl Huddleson as the Lead Tech for the Seneca facility. Huddleson had twenty-seven years of experience in the electrical field and fifteen years of experience with WSSC. He had spent twelve of those years at the Seneca facility. Finally, Dan Moler was selected as Lead Tech for the Potomac facility after each of the remaining candidates, including Appellants, withdrew from consideration for that position.

Although WSSC published a single job description for the Lead Tech positions and required the facilities to interview the individual ultimately selected for promotion, the selection processes at the various facilities were otherwise nonuniform. WSSC allowed "[e]ach of the plants [to] develop[] its own evaluation criteria, questions, and ranking system for the candidates." J.A. 791. The interviews at each facility varied in

length and content.  At some facilities, the interview questions did not relate to the principal requirements of the job.  For instance, at Piscataway, Porter and Proctor were asked about their personal lives.  J.A. 1026, 1307.  In some instances, there was a lack of uniformity with regard to the questions asked within a particular facility.  Although the Western Branch interview panel produced a list of purported interview questions, Ham could not recall being asked all of the questions listed on the roster, and remembered being asked questions not included on the roster.  J.A. 511.

Most troubling, however, is the fact that at some plants a particular attribute was considered an asset, at others, a liability.  For instance, Ham's service as an electrical inspector contributed to his nonselection at Western Branch: "as a longtime inspector, he had been away from the daily operation and maintenance issues for a plant for a number of years."  J.A. 786.  Whereas, when Clark was selected at Piscataway, a member of the interview panel noted that "as an Electrical Inspector, Mr. Clark had more experience than Mr. Proctor in preparing detailed written project reports on a regular basis."  Id. at 2073.  Likewise, while Porter and Proctor's lengthy tenure at WSSC was given minimal consideration, the Parkway selectee's years of experience in the industry influenced his promotion at Parkway.  This subjective, somewhat arbitrary, and nonuniform selection process led Porter to

9

conclude that the "interviewing process appeared to be a formality only and that a preselection already existed." J.A. 737.

In September 2001, Appellants filed complaints with the Equal Employment Opportunity Commission ("EEOC") alleging race-based discrimination in WSSC's promotion scheme. After investigating Appellants' complaints, the EEOC made a finding of discrimination, concluding that "[w]ithout fail, whenever one of the small class of Black applicants had superior credentials as posted by the job vacancy announcement, Respondent's decision-makers offered ever-changing subjective criteria to justify each of their non-selection for the promotions." J.A. 303, 305, 307. Thereafter, the EEOC invited the parties to join in a conciliation effort, which ultimately proved unsuccessful.

Ham, Porter, and Proctor were not the only ones to complain of disparate treatment at WSSC. Several African-American employees attested to the fact that WSSC had a discriminatory environment in which they were subjected to more stringent standards than their Caucasian counterparts. For instance, Galen Ellerbe, an African-American employee, also filed a discrimination complaint with the EEOC. In a signed declaration, Ellerbe indicated that "[a]t the time [he] started working for WSSC in 1992, [he] sensed hostility toward minorities who were ambitious and eager to advance, especially African Americans. Though unspoken, there was a general feeling that we should wait our turn, stay the course, and keep

10

quiet." J.A. 289. Likewise, Alton Walls, an African-American man who worked at WSSC from 1973 until 2000, indicated that "it is [his] feeling that minority employees at WSSC must perform above and beyond their non-Black counterparts in order to advance." Id. at 184.

In December 2002, WSSC granted retroactive promotions to Appellants. They were each promoted to Lead Tech, effective December 2000, and their pay and personnel files were adjusted accordingly. In its letters of promotion, WSSC made the following comments: "The retroactive nature of this promotion is designed to make you whole . . . . This promotion and adjustment of compensation is unconditional and without prejudice to your continuing to pursue pending allegations of discrimination before the U.S. Equal Opportunity Commission as well as other additional relief you may seek." J.A. 768-776. Although Proctor declined to accept his retroactive promotion to Lead Tech at the Laurel, Maryland facility, he received a corresponding increase in pay and grade.[5]

On April 9, 2003, Appellants filed a joint complaint in the district court asserting violations of Title VII and 42 U.S.C. § 1981. Thereafter, WSSC filed separate motions for summary

---

[5]WSSC's grant of retroactive promotions does not undermine the viability of Appellants' claims as they request additional forms of relief, including an order requiring WSSC to institute programs that eradicate the effects of past and present unlawful employment actions. J.A. 15.

judgment as to each Appellant.  Finding that Appellants had not adduced evidence from which a reasonable jury could find pretext, J.A. 1617, the district court granted WSSC's motions for summary judgment.  Appellants timely appealed.

## II.

We review the district court's grant of summary judgment de novo, viewing all facts and the reasonable inferences drawn therefrom in the light most favorable to the Appellants.  Anderson, 477 U.S. at 255.  Summary judgment may only be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

As Appellants intend to prove racial discrimination in violation of Title VII or Section 1981 by reference to circumstantial evidence, they may avail themselves of the familiar burden-shifting framework announced in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  See Love-Lane v. Martin, 355 F.3d 766, 786 (4th Cir. 2000) (McDonnell Douglas may be applied to claims arising under Section 1981 as well as Title VII).  Under the McDonnell Douglas analysis, a plaintiff seeking to prove discrimination in absence of direct evidence, must first establish

12

a prima facie case of discrimination. McDonnell Douglas, 411 U.S. at 802. In the failure to promote context, a plaintiff must show that: (1) he is a member of a protected class, (2) he applied for a position, (3) he was qualified for that position, and (4) he was rejected from that position under circumstances giving rise to an inference of discrimination. Id.; Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005). After a plaintiff establishes his prima facie case, the defendant responds by advancing a legitimate, nondiscriminatory reason for the employment decision. McDonnell Douglas, 411 U.S. at 802.

Once the defendant articulates a legitimate, nondiscriminatory reason for its promotion decision, the presumption of discrimination established by the prima facie case is rebutted, and the plaintiff must prove that the defendant's proffered reason is mere pretext for discrimination. Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 255-256 (1981); McDonnell Douglas, 411 U.S. at 804. This may be accomplished by showing that the proffered reason is false because "in appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993). Indeed, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative

13

explanation, especially since the employer is in the best position to put forth the actual reason for its decision." <u>Reeves</u>, 530 U.S. at 147. Accordingly, "[a] prima facie case coupled with probative evidence that the employer's explanation is false would counsel against granting the employer summary judgment unless the employer presented other strong evidence from which no reasonable factfinder could conclude that there was discrimination." <u>Price v. Thompson</u>, 380 F.3d 209, 214 (4th Cir. 2004) (internal quotation marks and citations omitted).[6]

---

[6]By applying the standard articulated in <u>Reeves</u>, this Court is not improperly placing WSSC at risk for liability. <u>See</u> <u>Price</u>, 380 F.3d at 217 n.5 ("[A]lthough <u>Reeves</u> will allow a plaintiff to survive summary judgment without presenting independent evidence of discrimination . . . , it will permit this only where the other evidence of discrimination is sufficiently strong to ensure that the employer is held liable for unlawful discrimination and not merely for inconsistent statements that arise from reading applications hastily or from being nervous during depositions.").

Here, Appellants Porter and Proctor have made out a strong prima facie case and adduced other evidence of discrimination. They were long-time employees of WSSC, successfully serving in the capacities for which they applied. Although the Caucasian Acting Lead Tech at Patuxent was automatically promoted to Lead Tech without considering any other applicants, Porter and Proctor were denied this same benefit. They not only had to compete for the positions that they were successfully carrying out, they were not selected for those positions allegedly because another individual was better qualified. They were denied promotion for a range of reasons, many of which did not directly relate to the duties and essential functions of a Lead Tech. Other employees perceived discrimination in the WSSC workplace. Finally, although WSSC's workforce had a high number of minorities, <u>no minority candidate was selected for any of the seven available Lead Tech positions</u>.

14

III.

As WSSC concedes that each of the Appellants has made out a prima facie case of racial discrimination, we proceed to examine whether Appellants have presented sufficient evidence to discredit each of WSSC's proffered legitimate, nondiscriminatory reasons for failing to promote them. We review each of Appellants claims seriatim, beginning with Porter.

A.

WSSC advanced a variety of reasons for Porter's nonselection for the Lead Tech positions at Western Branch and Piscataway. Because many of these reasons bear little, if any, connection to the skills required of a Lead Tech, as measured by WSSC's position description, a jury could reasonably conclude that they are not worthy of credence and demonstrative of pretext.

1.

We begin by examining the selection decision at Western Branch. In March 2004, Floyd Johnson, the decisionmaker at Western Branch, elucidated his bases for failing to promote Porter to the position of Lead Tech. Johnson claimed he selected Chris Barnhill, a Caucasian male, because of Barnhill's strong communication skills, involvement in the TPO Initiative, and familiarity with the Western Branch facility. J.A. 2429-30. In deciding to hire

15

Barnhill, Johnson acted in disregard of the unanimous advice of the members of the interview panel, who all preferred Porter. Id. at 2430.

Johnson, Group Leader and Plant Superintendent of the Western Branch facility, asked three individuals to assist him in selecting a Lead Tech for Western Branch. Johnson, who is Caucasian, recruited two African Americans, Carlin Penny and Clarence Pyles, and one Caucasian, Brian Mapes, to help him evaluate candidates. Every minimally-qualified applicant who so desired was invited to interview for the position. A total of twelve candidates, seven Caucasians and five African Americans, were interviewed. J.A. 2428. At the interviews, each candidate was asked to respond to twenty-six questions.[7] Id.

A jury could reasonably conclude that Porter is superior to Barnhill with respect to the essential, objective, articulated qualifications of a Lead Tech, and hence reject Johnson's asserted justification for hiring Barnhill, i.e., that Barnhill was the most

_____

[7]There is some dispute as to whether every question was indeed posed to every interviewee. Galen Ellerbe, who interviewed for the position of Lead Tech at Western Branch, did not recall being asked most of the questions listed on the question sheet and stated that his interview only lasted thirty minutes. Ham also suggests that the interviewers at Western Branch asked him questions that were not pertinent to the job, including whether he would be willing to go to a bar and socialize after work. J.A. 506, 511. This question was certainly not included on the formal list of purported interview questions.

16

qualified.  The Lead Tech position description makes abundantly

clear that it is principally a technical job, requiring:

> [t]horough knowledge of the standard practices, materials, tools, and equipment of the electrical/mechanical trade; thorough knowledge of electrical mechanical construction and maintenance, including installation and/or modification of all sizes of electrical conduit, cables, wires, switches, automatic starting equipment, etc.; some knowledge of electrical repair practices and methods; skill in the use of tools and adjusting defects in electrical and mechanical systems and equipment; ability to work from drawings, schematics, and specifications; ability to plan and review the work of others; good physical condition.

J.A. 1762.  Nevertheless, Johnson failed to explain at all how the

selectee was as qualified as Porter on this measure.  Johnson

simply stated "we were impressed with Mr. Porter's technical

knowledge," J.A. 2429, and justified his decision to promote

Barnhill based on qualifications not shown to be of principal

importance to the job.

The record provides ample evidence of Porter's objective

superiority for the position of Lead Tech.  There was a significant

twenty-year experiential gap between Barnhill and Porter.  Porter

had served as Acting Lead Tech at Anacostia for nearly three

years.[8]   In that capacity, Porter performed all of the

responsibilities of a Lead Tech, including, reviewing and

---

[8]Johnson attempted to explain away the significance of Porter's experience as Acting Lead Tech at Anacostia by suggesting that the position of Lead Tech at Western Branch is far more demanding.  We are not persuaded as WSSC defined the responsibilities of a Lead Tech across all facilities by reference to a single position description.

17

prioritizing job assignments, conducting group meetings, and preparing performance evaluations. J.A. 179. According to his supervisor, Alton Walls, "[i]n every sense of the word, Mr. Porter was 'in charge.'" Id. at 180. Walls elaborated: "Mr. Porter had exemplary performance during his tenure as Acting Lead Tech. There were no major breakdowns. Everything ran smoothly. He knew the equipment; he knew the maintenance needs. He also knew the people and their abilities. He communicated well with his staff." Id. In sum, at the time of his application for a permanent Lead Tech position, Porter had twenty-two years of experience at WSSC and had carried out his responsibility as Acting Lead Tech in an "exemplary" fashion. Id. at 180.

By contrast, when Barnhill applied as Lead Tech, he had only worked at WSSC for six years, only served as an Electrical/Mechanical Technician for two years (as compared to Porter's twenty-two years), and did not possess the minimum qualifications listed in the job description. As a consequence, Barnhill was only permitted to compete for the position because his supervisor, Alton Walls, agreed to recommend him for the position of Lead Tech so that he might circumvent the official job requirements.[9] J.A. 181.

_____

[9]Under WSSC policy, an individual initially deemed ineligible for a particular position because of a lack of minimal qualifications could submit a memorandum from his supervisor attesting to his suitability for the position. J.A. 1751-52. As each of the Appellants possessed the minimum qualifications

18

Lest anyone mistake Walls's recommendation of Barnhill to mean that he considered Barnhill to be as qualified as Porter, Walls stated unequivocally that

> [his] recommendation for the Lead Tech position was Benjamin Porter. Intimately familiar with both Mr. Barnhill's qualifications and Mr. Porter's qualifications, [Walls] chose Mr. Porter because of his years of experience and his performance in the Acting Lead Tech position at Anacostia. Mr. Barnhill simply did not have the leadership experience Mr. Porter had. In addition, Mr. Porter had worked at [sic] number of WSSC facilities over his 20-plus years of service; Mr. Barnhill had only had the opportunity to work at Western Branch.

Id. at 182.

Moreover, that Johnson himself identified deficiencies in Barnhill's skills and experience calls into question whether he in fact considered Barnhill the more objectively qualified candidate. In Barnhill's 1999-2000 evaluation, Johnson stated that in taking on the responsibility of Lead Tech:

> Mr. Barnhill must learn a new job that requires new skills. He will need to balance the needs of being a supervisor and manager with the demands of the equipment. He will need to be directly involved in some field repairs but will also need to manage all maintenance efforts. The new areas of personnel matters and administrative paperwork will need to be mastered to be an effective Lead E/M Technician. This will be a challenge that should be successfully overcome with his demonstrated learning ability and determination.

J.A. 2440. In promoting Barnhill to the Lead Tech position, Johnson inexplicably showed greater confidence in Barnhill's

---

delineated in the Lead Tech job description, they did not need to avail themselves of this alternate qualification method.

19

ability to learn quickly than in Porter's three-year track record as an Acting Lead Tech.

Although an "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria . . .," Burdine, 450 U.S. at 259, on this record, a jury could reasonably conclude that Porter was far more qualified than Barnhill with regard to the skills WSSC professed to be pertinent to the job. While Barnhill did not possess the articulated minimum qualifications for the position, Porter had two decades of experience at WSSC and had performed the job of Acting Lead Tech in a superior fashion. A jury could logically conclude that any reasonable employer would deem an individual who meets the stated qualifications of the job to be more qualified than one who does not. Mohammed v. Callaway, 698 F.2d 395, 400 (10th Cir. 1983) ("The only reasonable inference to be drawn from this evidence is that a candidate who meets the specific requirements in the job announcement is better qualified than one who must resort to alternative criteria."). Accordingly, we find that Johnson's decision to select Barnhill over Porter may be indicative of pretext.

We find further evidence of pretext in Johnson's preoccupation with subjective, tangential qualities such as written expression. Courts have repeatedly found that an employer's decision to emphasize qualities not pertinent to the job in selecting a

20

candidate is probative of pretext.  See, e.g., Durley v. APAC, Inc., 236 F.3d 651, 656-57 (11th Cir. 2000) (summary judgment against plaintiff not appropriate where plaintiff demonstrated that employer emphasized qualities not relevant to the position over pertinent qualities); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1226-27 (2d Cir. 1994) (failure to include external communication skills in an advertisement for a job suggested that employer's failure to interview candidate based on her alleged lack of experience with external communication created a genuine issue of material fact regarding pretext); Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1110 (8th Cir. 1994) (discharged employee discredited employer's statement that it retained another employee because of his superior computer skills because, among other things, the need for computer skills was not mentioned in the retained employee's job description); see also Colon-Sanchez v. Marsh, 733 F.2d 78, 82 (10th Cir. 1984) (employer's decision to hire nonminority candidate because of his superior administrative skills was not pretextual where the job description demonstrated that administrative skills were pertinent to the position). Additionally, "the use of subjective criteria is relevant to a claim of racial discrimination [though], standing alone, it does not prove a violation of either Title VII or § 1981." Mallory v. Booth, 882 F.2d 908, 910 (4th Cir. 1989).

Johnson justified his hiring decision by grasping at a comment in one of Porter's evaluations, which suggested that Porter needed to improve his written and oral communication skills. Johnson quoted the following language from Porter's 1998-1999 evaluation: "[I]f Ben is to be a more successful supervisor he would need to improve his writing and communication skills. I have not seen the effort that is needed by Ben to make improvements in these areas, as this is a must if he wants to be successful in the management area." J.A. 2429. Johnson stated "[t]hese skills were important to [him], as [he] relied heavily on the Lead Tech to prepare written reports and perform other administrative paperwork as part of the job." Id. Johnson gave dispositive weight to this concern as if to suggest that written communication skills are central to the job of Lead Tech. However, as Appellants note, the level of written work required of a Lead Tech is so minimal that it was not even referenced (or alluded to) in the job description. J.A. 1762. A jury could reasonably conclude that if written communication skills were indeed essential to the job, WSSC would have referenced them in the position description. See, e.g., Courtney v. Biosound, Inc., 42 F.3d 414, 421 (7th Cir. 1994) ("The advertisement stated that the ideal candidate must be research-oriented but said nothing about communication skills. Given Biosound's claim that it had placed a 'high premium' on finding an individual who could satisfy its 'unique communication needs,' a reasonable juror could conclude

22

that Biosound would have included this qualification in the job listing had it honestly believed that it was of primary importance for the position.").[10]  Accordingly, WSSC's own statement of the essential functions of a Lead Tech, as memorialized in its written job description, permits a reasonable inference that Johnson's stated concern for written communication skills is pretextual.[11]

Moreover, as Appellants point out, even if a Lead Tech needs to be an effective oral and written communicator, Porter's successful performance as Acting Lead Tech provides ample evidence of his ability to perform all the tasks required of a Lead Tech. While acting as Lead Tech, Porter's 1999-2000 evaluation and the statement of his supervisor, Alton Walls, reveal that he was performing all of the duties of a Lead Tech for thirty-three months

---

[10]Although a position description may not always encapsulate all of an employer's legitimate business concerns as "the business world is a 'dynamic' one in which the relative importance of various job qualifications may change over time," Dennis v. Columbia Colleton Med. Ctr., 290 F.3d 639, 647 n.2 (4th Cir. 2002), here the record shows that WSSC never attempted to adjust the job description to incorporate the alleged concerns for writing, administrative skills, or TPO Initiative involvement.  Indeed, even though WSSC revised its job description periodically and added preferences to the Anacostia 2002 job posting, WSSC did not add any mention of administrative skills, written expression, or TPO Initiative involvement.  The only skills included in the preferences section were technical in nature, reinforcing our belief that the Lead Tech position was in essence a technical one.

[11]For the same reasons, we find that Porter has created a genuine issue of material fact as to whether Johnson favored Barnhill based on Barnhill's involvement in the TPO Initiative.  As WSSC never mentioned involvement in the TPO Initiative in the Lead Tech job description, we find no pre-decisional evidence that it was a critical aspect of a Lead Tech's responsibilities.

23

in an exemplary fashion. Walls indicated that Porter was "performing all of the duties of a Lead Technician. He prepared evaluations, kept time records, scheduled the workload and distributed the work among his employees effectively. He contacted vendors for parts and materials needed, and prepared requisitions for those items." J.A. 1173. Moreover, while serving as Acting Lead Tech, Porter received the highest overall rating of "superior." Id.

Although Johnson was purportedly concerned about communication skills, the only evidence he provided as to Barnhill's communication skills took the form of a single laudatory statement made by Alton Walls, a man who unequivocally supported Porter over Barnhill for the position of Lead Tech at Western Branch. Johnson quoted Walls as stating, "Chris is a reliable team member, communicates very well and he sets an excellent example for the rest of his fellow co-workers to follow." J.A. 2037. Otherwise, the record is devoid of any indication as to whether Barnhill had effective written or oral communication skills.[12] Because WSSC's

_____

[12]Moreover, Johnson relied on an outdated evaluation of Porter's skills. In fact, Porter heeded his 1997-1998 evaluator's advice to "get in contact with the Educational Assistance Program personnel and see if there are some courses in English Comprehension to help in improving his writing skills." J.A. 1175. In 1999, he enrolled in an English Grammar review course and three computer courses. Id. at 1168-69. By November 2000, when the promotion decision was made, Porter had received his 1999-2000 evaluation signed by Brian Mapes, a member of the Western Branch interview panel. In that evaluation, Porter received the highest overall rating of "superior" and the evaluator noted that he

24

own statement, in the form of its position description, reveals that writing was not an essential function of the job and because Johnson does not show that Barnhill had superior written or oral communication skills, a jury could conclude that Johnson did not reach his decision because of Barnhill's communication skills.

While Johnson claimed that familiarity with Western Branch equipment was important, he provided no specific indication that Barnhill possessed superior knowledge of plant equipment.  As if Barnhill's six years at Western Branch necessarily resolved the question of who was more able to operate and direct the operation of equipment at Western Branch, Johnson stated "[w]hile [Barnhill] had fewer years at WSSC than Mr. Porter, Mr. Barnhill was nonetheless very familiar with the equipment at Western Branch, having worked there for approximately six years . . . ."  J.A. 2430.  Notably, Johnson did not directly compare Barnhill's knowledge to Porter's.  He simply indicated that Barnhill was "very familiar," with Western Branch equipment, but did not go so far as to say that Barnill was "more" familiar with any specific Western Branch equipment.  In fact, Porter's twenty-two year tenure at WSSC afforded him a significant degree of familiarity with Western Branch as he gained knowledge of the Western Branch Plant during

---

"verbally communicates well with his supervisors, peers, and other internal customers.  He voices his opinions, communicates his ideas to others, and gives direction to subordinates in a very congenial manner."  J.A. 1174.

25

his shift work at the facility.  J.A. 992-93.  Maintenance shift workers "could be called to any facility, plant, or location in the Commission at any time.  Therefore, [they] had a working knowledge of all WSSC facilities because [they] had to service all the facilities."  Id. at 286.  Moreover, although the facility at Western Branch differed from others because of its use of a sludge incinerator, Johnson did not indicate that Barnhill's six years at Western Branch gave him any special knowledge of the sludge incinerator as compared to Porter's shift work and twenty-two years at WSSC.  Accordingly, we find that a genuine issue of material fact exists as to whether Johnson promoted Barnhill out of an interest in selecting a candidate with the greatest knowledge of plant equipment.

Finally, Johnson's motivation for promoting Barnhill over Porter is further drawn into question because Johnson made his decision in contravention of the entire panel's recommendation and that of Alton Walls, who had supervised both Porter and Barnhill. While the fact that another decisionmaker might have made a different decision is not necessarily indicative of pretext, Hawkins v. Pepsico, Inc., 203 F.3d 274, 280 (4th Cir. 2000) ("The alleged opinions of Hawkins' co-workers as to the quality of her work are similarly 'close to irrelevant.'"), here there is reason to question Johnson's motives in deviating from WSSC custom.  At WSSC, decisionmakers rarely, if ever, disregarded the opinion of

26

the panel members, who were specifically selected because of their knowledge of the skills required of a Lead Tech. Walls pointed out that "it was very unusual for a selecting official to ignore the recommendation of the interview panel, especially when the recommendation was so overwhelmingly for one candidate over another." J.A. 183. In his twenty-seven year tenure at WSSC, Walls, who had been a selecting official and a panel member on numerous occasions, could not recall a single instance when the selecting official made a decision that was contrary to the panel members' recommendation. Id.

Because a jury could reasonably conclude that Porter was objectively better qualified for the position of Lead Tech and because Johnson considered subjective, nonessential qualities in favoring the selectee over Porter, we find that Porter has raised genuine issues of material fact regarding Johnson's failure to promote him, to the extent that a jury could find pretext. Such issues of fact are within the province of the jury and should not be resolved at the summary judgment stage.


2.

Next, we turn to the selection decision at Piscataway. Don Jacobs, the selecting official at Piscataway, claimed he denied Porter the promotion because he thought Randy Clark was more qualified. In particular, Jacobs expressed concern regarding

Porter's purported problems with written communication. J.A. 2418. He further contended that Porter failed to demonstrate the kinds of leadership and communication skills required of a Lead Tech in his interview. Id.

Don Jacobs (Caucasian), Group Leader and Plant Superintendent at WSSC's Piscataway Plant, selected Randy Clark, a Caucasian male, to fill the Lead Tech position at Piscataway. Jacobs asked three individuals, Gary Slaughter (Caucasian), Clarence Pyles (African-American), and Osama Amad (Arab-American), to assist him in selecting a Lead Tech, but he was the final decisionmaker. With the assistance of his panel, Jacobs culled through the applications and selected five candidates to interview, two Caucasian candidates (Randy Clark and Blaine Roelke) and three African-American candidates (Lester Collier, Ben Porter, and Andre Proctor). J.A. 2414.

In his 2004 declaration, Jacobs indicated that he declined to select Porter for the position because "[t]here was a significant amount of administrative work associated with the position, and I felt it necessary to have someone in the position who would be able to handle such tasks independently and effectively." J.A. 2418-19. The record before us presents a factual dispute as to whether administrative skills indeed played a decisive role in Jacobs's promotion decision. First, as stated above, WSSC's position description, its only pre-decisional statement as to the skills

28

required of a Lead Tech, made no mention of a need for administrative skills. Second, Jacobs had not previously indicated that Porter's allegedly weak administrative skills played any role in Porter's nonselection. On December 5, 2000, just after he made the decision to promote Clark, Jacobs sent the individuals who had interviewed for the Lead Tech position an email explaining his reasons for selecting Randy Clark. In that email, Jacobs justified his decision on the following grounds:

> Using the information from the recent round of Lead Tech interviews I was able to chose [sic] the person who I felt was most knowable [sic] about the electrical/mechanical equipment at Piscataway and our remote stations. In addition I wanted a Lead Tech that could help bring the E/M & Operations folks closer together as a team. A person who has worked both as an operator and an E/M Tech seemed like a good match. For these reasons Randy Clark will be recommended for this position.

J.A. 2424. As Jacobs did not mention administrative skills as a justification for his decision at the outset, his post-hoc claim that administrative skills had a determinative impact on his decision is probative of pretext. Dennis, 290 F.3d at 647 (citing EEOC v. Sears Roebuck, 243 F.3d 846, 852-53 (4th Cir. 2001)) ("The fact that an employer has offered inconsistent post-hoc explanations for its employment decisions is probative of pretext."). Finally, as previously stated, even if such skills are of value for the job, Porter's thirty-three month successful stint as Lead Tech at Anacostia, which led to glowing evaluations, indicates that he possessed all the skills required of a Lead Tech,

29

including any minimal administrative skills that may have been of value.

Jacobs also relied on Porter's interview to determine that Porter lacked the kind of communication and leadership skills required of a Lead Tech. Because there are compelling reasons to question the decisive effect of the Piscataway interviews, we find that a reasonable jury could mistrust Jacobs's statement as to the import of the interview process. First, Porter testified that his interview lasted twenty minutes and that he was not asked many questions pertinent to the job. J.A. 1025-26. He explained, "there wasn't any questions answered that pertained to the plant." Id. at 1029. The interview left Porter with the firm conviction that the interview process was a mere formality and that Clark had been preselected. Id. at 737. Further, Appellants contend that Clark withdrew from consideration at the Western Branch Plant because he knew he would be selected for the position at Piscataway. See, e.g., id. at 1303-04. Although preselection, alone, is not indicative of discrimination, Anderson, 406 F.3d at 271, it can support a finding of pretext in conjunction with other evidence.[13]

_____

[13]Additionally, Porter questions whether the members of the selection committee all independently determined Clark to be the best candidate. Appellants' Br. at 13. Porter contends that the interview process at Piscataway shows that, in fact, not all interviewers preferred Clark. He supports his argument by drawing the Court's attention to an exhibit, which he believes reflects how members of the selection committee scored candidates after their

30

Jacobs's assertions aside, the record provides ample evidence of Porter's strong leadership abilities. Individuals who worked with Porter praised his leadership skills. In Porter's 1997-1998 evaluation, Alton Walls explained how Porter came to be entrusted with particular leadership responsibilities: "Because of his positive attitude and his firm grasp of the knowledge on the equipment and his fellow co-workers, Ben has been put in charge to oversee the Anacostia Zone's day-to-day operation." J.A. 1175. In Porter's 1999-2000 evaluation, Brian Mapes remarked that Porter "gives direction to subordinates in a very congenial manner." Id. at 1174. His subordinates concurred: "Mr. Porter was a very good supervisor. He treated everyone fairly and dealt quickly to resolve any issues that arose. I found it easy to talk to and communicate with him." Id. at 1151. "Mr. Porter was a very good leader and seemed to have the finesse to be a good supervisor. He always listened but gave clear instructions and priorities. He was a good motivator and things worked smoothly under his supervision." Id. at 1161.

---

interviews. According to Porter, not all candidates for the Piscataway Lead Tech position had the benefit of an interview by every member of the selection committee. Thus, Porter maintains that when the interview scores were totaled, those candidates who were interviewed by a greater number of individuals received an unfair advantage. He believes the document shows that Clark was interviewed by five people, while he and Proctor were only interviewed by three people. Because WSSC correctly notes that the document was not authenticated, we decline to consider it and accordingly find insufficient factual support for Porter's contention.

While Clark received praise for his informal leadership as an Electrical/Mechanical Technician, "Mr. Clark maintains a good relationship with his fellow employees and continues to provide guidance to those employees less experienced than himself," J.A. 2061, he, unlike Porter was not selected to act as a Lead Technician, and thus had not experienced the responsibility associated with such a supervisory position. Additionally, Clark's evaluations focused on his ability to act with little supervision rather than on an ability to supervise others. Thus, a jury might disbelieve Jacobs's assertion that he considered Clark's leadership skills to be superior to Porter's.

We believe Porter has raised a genuine issue of material fact as to whether Jacobs decided not to promote him based on administrative and leadership skills. Never before had Jacobs expressed concern for administrative skills. And, other than a cursory interview, the record provides no evidence that Clark was a more able leader than Porter. Rather, the record reflects that Porter's leadership skills were superior to Clark's.

In sum, we conclude that a jury could reasonably find that the decisionmakers at Western Branch and Piscataway were dissembling when they proclaimed that the selectees were more qualified than Porter as their justifications are post-hoc and based on subjective, nonessential qualifications to the exclusion of more relevant considerations. Porter had a twenty-two year performance

32

history and received glowing reviews while serving as Acting Lead Tech. If an employee with Porter's record of performance cannot get past summary judgment, we are left to wonder who can.

B.

We now address Proctor's claims of discrimination. Although Proctor applied for two Lead Tech positions relevant here, he only challenges his nonselection at Piscataway.[14] In his April 6, 2004 declaration, Jacobs offered the following allegedly legitimate, nondiscriminatory reasons for failing to promote Proctor. Jacobs stated that Proctor did not have Clark's unique combination of skills and experience. J.A. 2417. Specifically, Jacobs asserted that although Proctor had served as Acting Lead Tech, he had not performed many of the administrative duties of a Lead Tech. Id. He further alleged that Proctor did not have the consistently high level of performance that Clark possessed. Id. Finally, he claimed that Proctor was not as familiar as Clark with the recent plant upgrades. Id.

First, in his affidavit in support of summary judgment, Jacobs indicated that he was concerned that the Lead Tech have strong administrative skills: "it was important to me that the successful

---

[14]Proctor attempted to apply for the position at Western Branch, but his application went to Parkway because he had attached the Parkway job number to the application and Human Resources (if they detected it), did not notify him of the error.

candidate have administrative and computer skills [sic] would enable them to perform the administrative tasks which were a significant part of the job." J.A. 2414. Yet, as indicated above, Jacobs's concern for administrative skills appears to have arisen only after the hiring decision was made and after Appellants filed their EEOC complaints. The only pre-decisional reference to administrative skills came in the form of two questions allegedly posed during the interview by Clarence Pyles who was not the actual decisionmaker. That Jacobs did not pose a single question about administrative skills, that the job description made no mention of administrative skills, and that he previously explained his decision without regard to administrative skills, at least creates a genuine issue of material fact as to whether this quality was either significant or decisive. Accordingly, we agree with Proctor's assessment that Jacobs's purported concern about administrative proficiency developed after Appellants' discrimination complaint was filed, and is thus probative of pretext. See Dennis, 290 F.3d at 647.

Next, Jacobs offered Clark and Proctor's performance histories as an additional justification for his promotion decision. He claimed that Clark received "commendable" evaluations from 1996 to 1999 while Proctor received "fully satisfactory" and "needs improvement" evaluations. J.A. 2417-18. In so doing, Jacobs

34

misrepresented and omitted important components of Proctor's performance history. This suggests pretext.

Jacobs misrepresented Proctor's record when he stated that Proctor received "needs improvement" ratings during the period of 1996 to 1999. In fact, the record before us, which does not include Proctor's 1997-1998 evaluation, shows that Proctor received only one "needs improvement" rating during that time and that his other "needs improvement" ratings were superceded by a "fully satisfactory" evaluation. The circumstances of that review period merit brief elaboration.

In 1995, Proctor and two other employees committed a safety violation though no one was seriously injured. J.A. 1253-56. Although Proctor testified that he was not directly responsible for the violation, as the most senior person on the job, he accepted the blame for the error and was disciplined accordingly. Id. at 1255-57. At the time of his annual evaluation, a dispute ensued as to whether the safety violation required a "needs improvement" rating. Although his initial evaluator gave him a "fully satisfactory" rating, the Manager of Facilities Maintenance instructed the evaluator to downgrade Proctor because "guidelines indicate[d] that a Needs Improvement should normally follow a written warning." J.A. 1414. The evaluator reluctantly adjusted Proctor's rating to "needs improvement." Id. at 1415. On February 10, 1997, the Manager of Facilities Maintenance issued his own

35

evaluation indicating that Proctor deserved a "needs improvement" rating. Id. 1414-15. On that same date, however, another evaluator generated a separate evaluation, indicating that in light of his investigation of the safety violation, he was changing Proctor's rating to "fully satisfactory" because this was Proctor's first and only safety violation. Id. at 1423-24.

Additionally, a jury might find it suspect that Jacobs failed to mention that Proctor was rated overall "commendable" in his 1999-2000 evaluation, while serving in the Acting Lead Tech capacity. J.A. 816-17. Given that Proctor's single "needs improvement" rating occurred more than four years before the promotion decision and that Proctor had received a "commendable" evaluation just prior to the promotion decision, a jury could reasonably find that Jacobs's alleged concern over Proctor's performance evaluations was pretextual. Proctor's 1999-2000 evaluation, received while Proctor was serving as Acting Lead Tech at Piscataway, was the best predictor of his likely performance as a Lead Tech, yet Jacobs failed to discuss this evaluation.

Jacobs's underestimation of Proctor's knowledge of plant upgrades may be probative of pretext. Proctor began working at WSSC in November 1976. He began his career with WSSC with a four-month stint at the Anacostia Depot, and has spent the remainder of his career at the Piscataway Plant. During his twenty-plus years at the Piscataway Plant, Proctor gained extensive knowledge of the

36

equipment in the plant as well as plant upgrades. Proctor testified that "[o]ver [his] period of time at Piscataway [he's] been involved in all of the upgrades." J.A. 1244. Proctor's 1999-2000 evaluation stated that his time at Piscataway "allowed him to witness significant upgrades to the plant and develop a good working knowledge of the plant equipment and operational process." Id. at 816 (emphasis added).

Additionally, there is a factual dispute as to whether Jacobs overstated the significance of the plant upgrade in which Clark was involved. While Jacobs claimed the biological nitrogen removal (BNR) upgrade involved half of the plant, Proctor stated it only affected a small fraction of the plant and that he had become familiar with those upgrades by perusing manuals and asking questions. J.A. 1273, 1313. Proctor elaborated: "Piscataway is a large plant. To put focus on one little section of the plant where we did upgrades is deceiving." Id. at 1313. Proctor further explained that Clark was not stationed at Piscataway when he was working on the BNR upgrades. Id. at 1311. Instead, Clark was working as an inspector at a variety of facilities. Id. In its position statement to the EEOC, WSSC indicated that being an inspector was a disadvantage as it meant that "[the candidate] had been away from the daily operation and maintenance issues for a plant for a number of years." Id. at 786.

Moreover, the fact that Jacobs failed to explain how Clark was more capable of serving as Lead Tech than Proctor, who served successfully in the Acting Lead Tech capacity for nine months (without any commensurate increase in pay), is probative of pretext. Jacobs did not explain why Proctor was hand-selected to serve as Acting Lead Tech if another person at the plant, such as Clark, was more qualified for the position.

We are also troubled by particular procedural irregularities in the selection process at Piscataway.[15] Like Porter, Proctor was concerned about the manner in which interviews were conducted at Piscataway. He "expect[ed] to be asked more technical questions or more questions related to job duties . . . ." J.A. 1307. Instead, he recalled being asked about his hobbies and his children. Id. He too became concerned about his likelihood of being selected when he "saw Randy [Clark] back out of the Western Branch position . . . ." Id. at 1304. In the end, he, like Porter, came to believe that the "the questions had [no] impact on the selections," as the determination of who would become Lead Tech had already been made. Id. at 1309.

In sum, we find sufficient evidence of pretext from which a jury could conclude, as did the EEOC, that Jacobs was dissembling

---

[15]Proctor, like Porter, questions whether individuals who were interviewed by a greater number of people at Piscataway received an unfair advantage in the promotion process. We are not persuaded by Proctor's argument for the same reasons we found Porter's argument unavailing.

38

when he stated he failed to promote Proctor to Lead Tech on account of alleged administrative deficiencies, poor evaluations, and lack of knowledge of plant upgrades.  The EEOC properly noted that

> [Proctor] had significantly more experience at Piscataway than the applicant who was promoted over him.  He also has spent several months working in the capacity as "acting" supervisor which was noted in his performance evaluation given three days after [Proctor] applied for the promotion.  That same performance evaluation, with a commendable rating, praised [Proctor's] experience which "allowed him to witness significant upgrades to the plant and develop a good working knowledge of the plant equipment and operational process."

J.A. 306.  Accordingly, we conclude that the district erred in granting WSSC's motion for summary judgment with respect to Appellants Porter and Proctor.[16]

C.

Unlike Appellants Porter and Proctor, Ham cannot demonstrate that the reason given for his nonselection for promotion at Western

---

[16]Additionally, we note that Porter and Proctor are not evaluating themselves on their own criteria.  See Anderson, 406 F.3d at 269 ("[A plaintiff] cannot establish her own criteria for judging her qualifications for the promotion.  She must compete for the promotion based on the qualifications established by her employer.").  Nor do they base their claims on a self-assessment of their abilities.  See, e.g., DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998) (plaintiff's self-assessment is not relevant to the discrimination inquiry).  Rather, Appellants rest on their employer's pre-decisional expression of the essential functions and duties of a Lead Tech as encompassed in the job description, and on the positive evaluations they received while acting as Lead Techs.

Branch and Seneca was pretextual.[17] At both facilities, the decisionmaker based his failure to promote Ham on a concern regarding Ham's style of management. Because the record shows that Ham has been consistently criticized for his "abrasive" management style and because effective management is a legitimate qualification for the position of Lead Tech, Ham cannot rebut WSSC's proffered legitimate, nondiscriminatory reason for failing to promote him.

---

[17]Ham applied for the position at Piscataway, but was denied an interview. Ham claims that the reason given for denying him an interview, i.e., concerns regarding his rigid and abrasive style, were pretextual, but he does not directly challenge the hiring decision at Piscataway.

Although Ham applied for the position of Lead Tech at Potomac, he maintains that he withdrew from consideration because he felt that applying was futile. Accordingly, Ham attempts to avail himself of the "futile gesture" doctrine announced in Int'l Bhd. of Teamsters v. United States, 431 U.S. 324 (1977). Under that doctrine, "the failure to apply for a job does not preclude recovery if a claimant can demonstrate that he would have applied but for accurate knowledge of an employer's discrimination and that he would have been discriminatorily rejected had he actually applied." Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1451 (4th Cir. 1990). Ham, however, has not offered evidence sufficient to show that applying at Potomac would have been futile. His primary contention is that a call he received from a member of the Potomac interview panel inquiring as to whether he was still interested in the position at Potomac was intended to discourage him from applying. The panelist's inquiry alone is not clearly indicative of racial animus nor does it suggest "that any such application on [Ham's] part would be met with certain rejection." Brown v. McLean, 159 F.3d 898, 904 (4th Cir. 1998). Moreover, Ham's claim of futility is further undermined because he was contemplating withdrawing his application before he received the allegedly discouraging phone call. J.A. 591-92. Accordingly, although the "futile gesture" doctrine is a viable legal principle, Ham cannot properly avail himself of it here.

40

Though it is self-evident that a "Lead" Tech would be required to show strong leadership skills, the position description reinforces this point. A Lead Tech "directs the work of two or more Electrical Mechanical Technicians . . . ;" "[d]irects and assigns subordinate Electrical/Mechanical Technicians, Electrical Mechanics, and helpers in the installation, repair, or modification of various types of equipment, systems, and devices;" and "[o]versees or takes the lead in the more difficult electrical or mechanical maintenance activities." J.A. 1762. Accordingly, we conclude it was not improper for the decisionmakers at Western Branch and Seneca to consider Ham's style of leadership in deciding whether to promote him.

Additionally, Ham cannot show that the decisionmakers' concerns were manufactured. There is ample evidence in the record to show that Ham's management style was a cause of complaint. Ham's 1996-1997 evaluation included the following comment: "[Ham] has had his ups and downs with the Commission personnel in the building." J.A. 834. His 1997-1998 evaluation stated that

> [w]hen [Ham] present [sic] his ideas or point of views [sic] he has a very strong delivery and may be received as a threat by others. [Ham] needs to explain his ideas in more details [sic], and be more patient when responding to questions when presenting his ideas. A little work in this area would be most beneficial to his upward movement at the Commission.

Id. at 807.

41

Ham acknowledged the repeated criticism of his tone and style of management.  At deposition, he testified that he was counseled to "lessen [his] approach when talking to others."  J.A. 808. And, he described his management style as follows:  "To the point. I speak my mind."  Id. at 451.  Finally, at oral argument, Ham's attorney conceded that Ham was frequently criticized for his allegedly "abrasive" and "militaristic" communication style.  Ham, however, would like to show that his positive evaluation in 1999-2000 demonstrates that any concern regarding his leadership style is no longer warranted.  Though the evaluator stated "[Ham's] communication skills have improved and he maintains an effective working relationship with our contractors and subcontractors," he still rated Mr. Ham's customer relations skills as "fully satisfactory."  J.A. 821-22.  As both of the facilities proffered the same reason for not selecting Ham for the position of Lead Tech, we make only these brief facility-specific comments.


1.

We begin by examining the promotion decision at Western Branch.  Floyd Johnson claimed he declined to hire Ham at Western Branch because he was advised that Ham had a rigid and abrasive communication style.  J.A. 2431.  Johnson concluded that he "did not believe that such a communication style would allow Mr. Ham to effectively work to promote harmony between the employees in the

42

Operations and E&M groups at Western Branch." Id. at 2432. This explanation was consistent with WSSC's position statement, which stated that Ham was not selected for the position in part because "his management style suggested he would require considerable adjustment to the recent team building atmosphere that was being emphasized by the Commission's management." Id. at 786. As stated above, Ham's evaluators shared Johnson's concerns. Thus, Ham cannot demonstrate the falsity of these allegations.

2.

Finally, we consider the selection decision at Seneca. In his April 2004 declaration, Tom Heikkinen (Caucasian), Group Leader and Plant Superintendent at Seneca, indicated that he decided not to hire Ham because Ham exhibited a "'military bearing - chain of command' style of communication." J.A. 1843. WSSC's position statement echoed these concerns: "Mr. Linwood Ham was not selected for the position due to his leadership style, which was not conducive to the Commission's new emphasis on teaching others and being a team builder." Id. at 785. Instead, Heikkinen selected a Caucasian male, Carl Huddleson, for the position of Lead Tech, following the unanimous recommendation of interview panel members Shandy Richardson (African-American) and Charles Rupprecht (Caucasian).

43

As indicated above, the record reflects that Ham was frequently criticized for his style of leadership. Thus, he cannot show that Heikkinen's concern was manufactured or pretextual. Moreover, Ham deals a fatal blow to his charge of discrimination in saying he "would have gave [Huddleson] the position if [he] was the hiring supervisor." J.A. 564.

Accordingly, we find that the district court properly granted summary judgment on Ham's claim of discrimination.

IV.

For the foregoing reasons, the district court's decision is hereby affirmed in part, reversed in part, and remanded.

<u>AFFIRMED IN PART,</u>
<u>REVERSED IN PART,</u>
<u>AND REMANDED</u>

44

TRAXLER, Circuit Judge, concurring in the judgment:

I agree that Appellant Ham has failed to produce sufficient evidence that the reasons advanced by WSSC for his nonselection for promotion were a pretext for race discrimination. I also agree that Porter and Proctor, unlike Ham, <u>have</u> produced sufficient evidence from which a jury might conclude that WSSC's legitimate, nondiscriminatory reasons for not selecting them for promotion were pretextual.

I write in addition to my colleagues, however, because I view the evidence as much closer than they. For example, I cannot conclude from the record before us that the evidence produced thus far establishes that Porter or Proctor were objectively better qualified for the position. I also question the admissibility of some of the evidence presented to us on appeal, and recited at times by the majority, but leave those determinations to the trial judge on remand. In sum, because I do agree that Porter and Procter have established a genuine issue of material fact regarding the reasons for their nonselection and that they are entitled to a fair opportunity to demonstrate that WSSC's assigned reasons were a pretext for race discrimination, I concur in the judgment which affirms in part and reverses in part the district court's grant of summary judgment.

45